WILLIAMS, J.
In this child custody dispute, the defendant, Yadaira Lowe, appeals a trial court judgment designating the plaintiff, Brian Lowe, as domiciliary parent of the minor children. For the following reasons, we reverse and remand.
FACTS
The plaintiff, Brian Lowe (“Brian”), and the defendant; Yadaira Lowe (“Yadaira”), were married on September 3, 2005 in Orlando, Florida. They had two children, L.E.L., who was born on July 18, 2009, and L.G.L., who was born on November 23, 2011. During the marriage, the parties moved to several states in connection with Brian’s administrative career with various professional sports teams. Eventually, the parties established their matrimonial domicile in the state of Tennessee.
In 2013, Brian was terminated from an administrative position in Memphis, Tennessee.[1] , Having no financial resources, in February 2014, the parties and their young children moved to Farmerville, Louisiana, to live with Brian’s father. At the time of the move, Brian was hoping to gain employment as the athletic' director at Grambling State University (“GSÜ”),
On July 15, 2014, a domestic dispute ensued between Brian and Yadaira, which resulted in Yadaira calling the Farmerville Police Department. Yadaira accused Brian of “grabbing” her arms and attempting to “drag” her into a bedroom. Numerous witnesses testified with regard to the incident. Brian testified as follows:
| ⅞ [Yadaira] was going belligerent on us, and she was grabbed. She was cursing at iny father, and I told — and she wanted to go. She said, ‘Why don’t we talk?’ And she 'wouldn’t talk, and I grabbed her arm.
* * *
[S]he was upset and yelling and- screaming, and I grabbed her arm just like that to just move her, just like anything would be like grab [sic] her arm and move and say, ‘Let’s go in the room and talk.’ She never wanted to talk.
* * *
When questioned about the bruises on Ya-daira’s arms, Brian responded, “[S]he bruises easily. I mean, ’ I was grabbing her to get her into the room. I did not drag her or, anything like that.”
Yadaira testified as follows: she and Brian began to argue; Brian’s father told him to stop talking to her; she became upset with Brian’s lather because she felt that he did not. “have, a place in what was going-on between my husband and I[sic]”; Brian “kept grabbing me and tried to force me into the bedroom”; Brian hurt her arm and she told him tp stop; she called 9-1-1 and asked for help because she was “being *674 harassed and attacked” by Brian; she did not feel safe in the home; she told the 9-1-1 operator that Brian had abused her; “quite a few” police officers responded to the call; she told the first responding officer, Farmerville’s Chief of Police, Earnest Coulbertson, that Brian kept grabbing her, attempting to “pull [her] into a room”; she told Chief Coulbertson that she was afraid and that she needed to take her children and leave the home; Chief Coulbertson remained on the scene approximately “five or ten minutes” then left to respond to another call; she spoke with several police officers at the scene; Brian’s father told her that she could no longer live in the house; a female police officer told her that she had to leave the residence but she could not take the children with her; ¡(¡the female officer told her to take “what she could” and leave; the officer remained with her until she left the residence; the female officer saw that she was “in distress”; and, the female officer provided her with some information about DART (Domestic Abuse Resistance Team).[2]
Brian’s father, Ellis Lowe, Jr., testified as follows: Brian and Yadaira began to argue; he told Brian to stop talking to Yadaira; Yadaira turned around and told him to “stay out of it”; Brian stepped between him and Yadaira; Brian “got [Ya-daira] and pushed her away”; Yadaira was upset and the argument escalated; Ya-daira called the police; the police officers told Yadaira that she could not take the children out of the state;' he did not hear Yadaira tell the police officers that Brian had hit her; and he did not tell Yadaira to leave the house.
Chief Coulbertson testified as follows: he was dispatched to the Lowe residence regarding a “disturbance, possible domestic”; when he arrived, Yadaira was “very upset” and she “wanted to get her kids [and] leave”; he informed Yadaira that the police officers “could not take the kids from [Brian] to give to her”; he asked Yadaira if she had anywhere else to go; Yadaira told him that she wanted to go to Florida but she did not have the money to do so; he could not recall whether Yadaira made any allegations of abuse; and if Ya-daira had informed him that she had been abused, he would have included the allegations in his report.
On cross-examination, Chief Coulbertson admitted that he did not Lremain at the Lowe residence to complete the investigation because he was dispatched to the scene of an automobile accident. He also admitted that Yadaira could have reported the domestic abuse to another officer. He testified that he prepared the written police report based upon information he received when he arrived at the residence. Chief Coulbertson also admitted that he did not talk to any other officer to ascertain whether a supplemental police report was needed. On redirect examination, he stated that none of the other officers prepared a supplemental report.
Lieutenant Lori Taylor of the Farmer-ville Police Department testified as follows: she and Chief Coulbertson responded to a disturbance call at the Lowe residence; when they arrived, Ya-daira “was wanting to leave the house with her son and daughter”; Chief Coul-bertson interviewed Brian and Yadaira; Yadaira “ended up” leaving the residence without the children; and, she does not recall speaking to Yadaira about domestic abuse.
*675 On cross-examination, Lt. Taylor provided the following testimony about her decision to provide Yadaira with information about DART:
Because domestic abuse is not just physical, it’s also mental. She didn’t have a place to go. She said she didn’t have a lawyer. Like I say — so like I say, DART is our — we use it for all sorts of things, not just physical abuse.
[[Image here]]
It’s a resource [and] we thought [it] should be available to [her].
* * *
Jackie Hill, a DART advocate for Union Parish, also testified. She stated as follows: Yadaira came to the DART office seeking assistance on July 16, 2014; Ya-daira showed her some bruises on her upper arms and told |5her that Brian caused the bruises; Yadaira told her about past incidents of abuse inflicted by Brian; and, Yadaira chose not to seek a temporary restraining order or an order of protection because Brian was in the process of trying to obtain a job at GSU and she did not want to adversely affect his chances of doing so.
On cross-examination, Ms. Hill opined that Yadaira was a victim of domestic abuse. She reiterated her testimony that Yadaira chose not to complete the intake process because she did not want to adversely affect Brian’s prospects of gaining employment. She stated that Yadaira “just wanted to get her children” and return to Florida because she did not have any family members in the area. Ms.- Hill further explained -that DART offers assistance only to victims of domestic abuse;
Yadaira left Farmerville, after the incident involving the police. Because she did not have anywhere to live in Farmerville, she went to live with Brian’s mother in Monroe. Yadaira testified that she remained in Monroe for approximately two weeks. Thereafter, Brian’s mother informed her that she could no longer live with her.[3] Having no place to live in Louisiana, Yadaira returned to Kissimmee, Florida, where the home she owned before she married Brian is located. Yadaira testified that she left Farmerville because she was a victim of domestic abuse and she feared for her safety. She also testified that she left Louisiana because she did not have a job or anywhere to live.
On November 24, 2014, Brian filed a petition for divorce. He | ^requested to be designated the primary domiciliary parent of the minor children. He did not request child support. Brian also alleged that he “did not know the whereabouts of [Ya-daira]” and requested that a curator be appointed to represent her interests.[4] The curator filed an answer to the petition on Yadaira’s behalf. Subsequently, the curator located Yadaira and .served her with a copy of the petition. Yadaira filed an answer and reconventional,demand, requesting that she be named the children’s primary domiciliary parent.
A hearing was conducted on March 9, 2015. The testimony at the hearing revealed that Brian was unemployed and financially dependent on his father, a 67-year-old retiree. Brian testified that .he *676 had formed a “sport consulting company that consults all business operations for different sports platforms and organizations.”- However, he had not begun to derive any income from the business. Brian also testified he and his family moved to Farmerville because he wanted to pursue the position as GSU’s athletic director.
With regard to the children, Brian testified that L.E.L., the parties’ five-year-old son, was in kindergarten and was active in karate, basketball and swimming, as well as church and school-related activities. Brian also testified that L.E.L. traveled with him to participate in events for his consulting business. Further, Brian stated that he and his father took care of IvL.G.L., the parties’ three-year-old daughter. He testified that L.G.L. was active in dance and softball. He stated that he was in the process of “looking into a Head Start program” for her.
Yadaira also testified with regard to her love for her children. She stated that she had been the children’s primary caregiver all of their lives and that she prepared their' meals," scheduled their medical appointments and arranged their extracurricular activities. Yadaira testified that the only reason she left the children with Brian1 was because the police officers told'her that she could not take them with her. Furtheh, she testified that she and Brian decided to move to Farmerville because “we couldn’t pay our bills [and] my husband whs -pursuing the Grambling, the Grambling job.” She stated that she did not want to be dependent on Brian’s father. She described her feelings about being dependent on her father-in-law as feeling “devastated, horrible, embarrassed, alone [and] scared.” Yadaira also expressed' her belief that them move to Farmerville would be temporary.
Yadaira further testified with regard to incidents of abuse when she and Brian lived in other states. She stated that she chose to remain with Brian because she wanted her children to grow up with two parents. When asked why she chose not to file for an order of protection, Yadaira stated:
With the embezzlement already happening, I knew he — we were going through so much, and then I didn’t know what to do. I was in the state by myself; I didn’t have any friends. I knew that if I did the restraining order, I’d have to stay until the court, until the court date, and I didn’t know where to go. I didn’t have any family or' friends that I can stay with, would let me stay here [until] we got this resolved.
* * *
The evidence also revealed that the relationship between Brian and Yadaira, since her move to Florida, had been contentious, at best. Brian, Yadaira and Brian’s father testified regarding an occasion on which Yadaira came from Florida to Farmerville and wanted the children to spend the night with her at her hotel in Monroe. Brian refused to allow the children to leave his father’s house with Ya-daira and called the Farmerville Police Department to prevent Yadaira from taking the children with her. First, Brian testified that he did not know Yadaira was coming to get the children* Later, he admitted that he knew Yadaira wanted the children to spend the night with her but he did not want them to do so because he “did not trust her.” Thereafter, he stated that he did not allow the children to leave with Yadaira because he needed to speak with his attorney before he could allow the children to leave the house with her.[5]
*677 Yadaira testified that she and Brian had exchanged text messages and he knew she was coming to get the children. However, when she and her mother arrived at the house to get the children, Brian would not allow the children to leave with them. She stated that Brian called the police to prevent her from taking the children to visit with her at her hotel.
Mr. Lowe (Brian’s father) testified as follows: the family was “hajf asleep” when Yadaira and her mother, arrived; he did not know Yadaira and her mother were coming; Brian did not want the children to leave with | gYadaira “because she had not made any prearrangement”; Yadaira began to make “sarcastic” remarks; he told Brian to call his attorney; Brian did not want to prevent the children from seeing their mother but he was confused because of “all these possible legalities going on”; and, Brian called the police because he “did not approve of what [Yadaira and her mother] were doing.”[6]
At the conclusion of the hearing, the trial court granted domiciliary custody to Brian, stating:
Because the children have an established home here in Farmerville, their connection with — they have family here; they’ve been here almost a year. [L.E.L.] is in school here in kindergarten. I’ve decided that it’s in the best interest of the-children that they remain here in Farmerville, that Mr. Lowe would be the primary domiciliary parent. I would ask that any time that Mrs. Lowe comes to Farmerville that Mr. Lowe make the children available to her, unsupervised visitation, and that would include holidays, weekends, whenever, and her visitation would take priority over any plans that you may have for those children.
[[Image here]]
The court also expressed its . concerns with regard to Brian’s: unemployed status -and financial dependence on his father. The court stated:
I’m somewhat skeptical about his job prospects if he’s going to continue to -pursue a job as [Athletic Director] at Grambling State University, and if you can’t show to the Court that you can support your own family, then I’m going to reconsider this because apparently, Ms. Lowe is able to provide for her children without the assistance of — -without the type of assistance, total dependency that you have right now. For that reason, we have agreed |inthat we will have a hearing on this to look at the situation on'June the 19th.
[[Image here]]
The second hearing was held as scheduled. The testimony focused largely on the parties’ ability to financially provide for the children and their ability to provide a stable home. Brian testified that he had been hired as the physical education instructor at the New Vision Learning Academy, an elementary charter school in Monroe. On cross-examination, Brian testified *678 that he had been working at New Vision for approximately two weeks. He denied being a “personal friend” of the director of the school; however, he admitted that he had known the director “for several years.” He testified that he told the director that he needed a job, and she hired him immediately without interviewing him for the position. Brian further admitted that he did not tell the director the reason he was terminated from his job in Memphis and he admitted that he did not believe he would be able to maintain his position at New Vision if the administration discovered the reason he was terminated in Memphis. Further, Brian admitted that he had not been hired for the position at GSU. He stated that, although he had been pursuing the- position for more than a year, he had not told the university officials about the embezzlement allegation. He stated, “I don’t want to say it’s embezzlement. I was not charged or convicted for that.”
Brian further testified on cross-examination as follows: when Yadaira calls the children, he places the call on speakerphone to prevent the children from fighting over the telephone; he hears the conversations but he does not listen “intentionally”; he has never “intentionally” disconnected a Incalí between Yadaira and the children; he and the children continued to live with his father; he planned to get his own residence in either Farmerville' or Ruston; he had not earned any income since the prior hearing; he had not received a paycheck from New Vision; and, his father continued to provide for the children.
On redirect examination, Brian testified that since the March hearing, he had conducted a week-long football camp and had earned $1,500. He also stated that he had conducted a three-day consulting project at a charter high school in Monroe, after which-he earned $300.
Thereafter, in response to questions from the trial judge, Brian testified as to his plans if he is not hired by GSU. He stated .that he would either “stay with New Vision or I’m going to pursue the Athletic Director with Dr. Cannon, his opening up, and he agreed to have me out there.”[7] He also reiterated that he was employed at New Vision in Monroe and he worked from 8:00 a.m, until 5:00 p.m. However, he later stated that he would be able to drop his children off at school and pick them up in the afternoons because he had applied to become a substitute teacher in Union Parish (Farmerville).
The testimony also centered around another conflict that ensued when Yadaira came back to Farmerville to attend L.E.L.’s kindergarten graduation in May of 2015. Yadaira had initially planned to arrive in Farmerville on a Friday; however, her plans changed and she arrived on Thursday instead. Brian refused to allow the children to visit with Yadaira on Thursday | ^because they were expecting Yadaira to arrive Friday, and he did not “want [the children] to be confused.”
Yadaira testified first on cross-examination. She testified as follows: she was employed as a clerk in a school nutrition department for the Osceola School District in Kissimmee; she sent Brian $300 in child support in April; she was unable to send money in May because she traveled from Florida to Farmerville to attend her son’s kindergarten graduation; she had not sent any money for June because she had to travel back to Farmerville for the child custody hearing; her mother lives in Miami, which is approximately three and one-half hours from Kissimmee; her mother is *679 willing to move to Kissimmee to assist her with the children; she has an aunt and a cousin in Kissimmee; since she left, she would call and Brian would accuse her of harassing him; Brian attempted to “make [her] feel bad about not being with [her] kids”; she did not tell Brian that she wanted to reconcile with him; after talking to Brian on the telephone on one occasion, he sent her a text message in which he stated that she had told him that she loved him; she never told him that, so she responded to the message by telling Brian, “Good night.”
On direct examination, Yadaira testified with regard to the schools she wanted her children to attend if they are allowed to live with her in Florida. She also testified as follows:' prior to moving to Farmerville, she and her family had visited but had never lived in Louisiana; Brian had been pursuing the job at GSU for four or five years and had not been hired; other than her children, she does not, have any ties to Louisiana; and, she would 113not have had anywhere to live if she had remained in Louisiana.
When questioned about the status of her ability to co-parent with Brian, Yadaira admitted that she does not believe Brian will foster a relationship between the children and her if he is awarded domiciliary custody. She testified that Brian hangs up during her phone calls to the children. She further testified that, on multiple occasions, Brian refused to answer the telephone when she called and did not return the phone call.
On cross-examination; Yadaira testified that she has sent Brian $1,300, clothing and toys for the children since she left Louisiana. She explained that she has been unable to send money more frequently because she needs money to travel from Florida to Farmerville for court hearings and visits with the children. In response to questions posed by the trial judge, Ya-daira testified as follows: she, Brian and the children never lived in Kissimmee; Brian was physically, verbally and emotionally abusive to her before they moved to Louisiana; she did not report the abuse to the authorities; her children are the only family she has in Louisiana; and, she has not inquired about moving back to Louisiana. Thereafter, the following colloquy took place:
THE COURT: Under no circumstances would you return to live in Louisiana?
[YADAIRA]: I wouldn’t want to.risk my children and myself being here and if he doesn’t get the job at Grambling, there is nothing that says that he won’t move [from Louisiana]. Ten years in our marriage and we’ve moved four times: Pittsburgh, [Washington] D.C., Memphis, here. There’s nothing that’s going to keep him here.
THE COURT: Well, this Court would keep him here.
[[Image here]]
At the conclusion of the hearing, the trial court awarded joint custody and designated Brian as the primary domiciliary parent, stating:
I’m looking at Civil Code Article 134, which lists the factors in determining a child’s best interest. In looking at each of those, it’s hard for this Court to make a distinction between the mother or the father. They both can best love their children; that there is mutual affection between them and their children. They both have the capacity and disposition to provide their children "with love, affection, spiritual guidance, education. They both have, I’d say, basically equal capacity to provide the children with food, clothing, medical care, other mate *680 rial needs. At least now Mr. Lowe has a job that pays the same as Ms. Lowe.
* * *
It basically all comes down to the fact [that] the children are here in Louisiana[.][T]hey have a fairly stable home.
* * *
[Mr. Lowe has] the possibility of a good job at Grambling, and [he has] a pretty good support system here from everything I’ve heard. The children are here. And; Ms. Lowe, I can appreciate your feeling that you are trapped if you stay here in Louisiana and you probably had no choice but to move to Florida; but the fact is they are here in Louisiana and if I allow you to take them to Florida, then : by your moving to Florida, you’re taking the children away from their dad. That’s the way I see it.
And for that reason, I will name Mr. Lowe as the primary domiciliary parent. There will be joint custody.
[[Image here]]
The court granted visitation to-Yadaira and provided specific instructions that the visitation be exercised both in Louisiana and Florida.[8] Additionally, 11Bthe court encouraged both parents to communicate and share information -with each other with regard to the children and provided the parties -with various “co-parenting guidelines.”
Yadaira appeals.
DISCUSSION
Yadaira contends the trial court did not properly weigh the factors set forth in LSA-C.C. art. 134. She argues that the court placed great weight on the fact that she now resides in Florida. She also argues that the court disregarded | 1fithe fact that Brian has demonstrated that he is unable to financially provide for the children’s needs and to provide them with a permanent home.
It is well settled that the paramount consideration in any determination *681 of child custody is the best interest of the child. LSA-C.C. art. 131; Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731; Semmes v. Semmes, 45,006 (La.App.2d Cir.12/16/09), 27 So.3d 1024. The court is to consider all relevant factors in determining the best interest of the child. LSA-C.C. art. 134.[9]
The trial court is not bound to make a mechanical evaluation of all of the statutory factors listed in LSA-C.C. art. 134, but should decide each case on its own facts in light of those factors. Semmes, supra; Robert v. Robert, 44,528 (La.App.2d Cir.8/19/09), 17 So.3d 1050, writ denied, 2009-2036 (La.10/7/09), 19 So.3d 1; Bergeron v. Bergeron, 44,210 (La.App.2d Cir.3/18/09), 6 So.3d 948. These factors are not exclusive, but are provided as a guide to the court, and the relative weight given to each factor is left to the discretion of the trial court. Id.
The trial court has vast discretion in deciding matters of child custody and visitation. Semmes, supra; Slaughter v. Slaughter, 44,056 (La.App.2d Cir.12/30/08), 1 So.3d 788; Gaskin v. Henry, 36,714, (La.App.2d Cir.10/23/02), 830 So.2d 471. Therefore, the trial court’s determination will not be disturbed on appeal, absent a clear showing of an abuse of discretion. Bergeron v. Bergeron, 492 So.2d 1193 (La.1986); Semmes; supra; Slaughter, supra. As long as the trial court’s factual findings are reasonable in light of the record, when reviewed in its entirety, the appellate court may not reverse, even though convinced it would have weighed the evidence differently if acting as the trier of fact. Id.
haWe have reviewed this record in its entirety' and we are convinced that Brian and Yadaira are both loving parents who are equally capable ‘of providing love, affection and spiritual guidance for their young children. Yadaira provided uncon-troverted testimony that prior to her move to Florida, she was the primary care giver for the children: she prepared the meals, made their medical appointments, planned their activities and saw to their day-to-day needs. After Yadaira left Farmerville, Brian and his father jointly assumed the care for the children.
The paramount goal in custody cases is reaching a decision which serves the best interests of the children. In this case, we find that the trial court did not sufficiently weigh the best interest of the children. It *682 is clear that the paramount consideration in the trial court’s decision was the mother’s relocation from Farmerville to Florida.
At the time of the hearings, L.E.L. was five years old; L.G.L. was three years old. They had lived in Farmerville approximately one year. The only family they have in Farmerville is Brian and his father. However, they have other family members who live in Lincoln and Ouachita parishes.
The evidence also demonstrated that Brian was unemployed and totally dependent upon his 67-year-old retired father for food, shelter and daily needs for himself and his young children. When the second hearing was conducted in June 2015, Brian testified that he had obtained a job approximately two weeks before the hearing. It is unclear whether the job at New Vision was a full-time position or whether Brian was hired as a part 11flof the school’s summer enrichment program.[10] Although Brian stated that he intended to keep the job at New Vision throughout the following school year, he made several statements which suggest that the job at •New Vision was temporary. For example, Brian testified that “we have six weeks to go.” He also testified that his son was attending New Vision (in Monroe) that summer, but he would attend school in Farmerville when school started, and he (Brian) would be able to pick his son up from school (although he worked at New Vision until 5 p.m.). Thereafter, during Brian’s testimony about the job at GSU, he was asked about his plans if he did not obtain the GSU job. In his response, Brian did not mention the job at New Vision. Rather, he testified that he had spoken to the superintendent of schools for Union Parish about a “new A.D. position.” Further, when questioned about whether he planned to obtain his own residence, Brian testified that he would live in either Farm-erville or Ruston, “depending on where the job went[.]” Again, he did not mention the job at New Vision. Thereafter, he testified that he had applied to be a substitute teacher in Union Parish, again, without mentioning the job at New Vision.[11]
Additionally, Brian testified that he had earned approximately $1,800 since he had moved to Farmerville. He admitted that he and the children 12iiremained financially dependent on his father and that he has continued to pursue the position at GSU, which, to date, he has not obtained. Further, Brian and the children live with his father in a two-bedroom house. The testimony with regard to where the children sleep varied at the hearing. Brian testified that the children sleep in the home’s second bedroom. Brian’s father testified that the children sleep in various places-sometimes with him, sometimes with Brian and sometimes together in the second bedroom.
Yadaira testified that she has a full-time job which pays $15 per hour and provides medical insurance benefits for the children. She also testified that she and her mother are co-owners of a four-bedroom home in which the children would have their own *683 bedrooms. She further stated that she had purchased beds for the children and that she had begun to paint their bedrooms. Yadaira also, testified that if the children lived with her, L.G.L. would attend the preschool where she (Yadaira) works and she was trying to decide between two schools for L.E.L.
As stated above, both parents are willing to show love, affection and spiritual guidance for their children. However, our review of the record convinces us that the lower court’s ruling designating Brian domiciliary parent of the children is clearly wrong.
In discussing the factors set forth in LSA-C.C. art. 134, the trial court placed emphásis on the fact that the children reside in Farmerville, while Yadaira resides in Florida. Yadaira provided uncon-troverted testimony that she did not choose to leavé her children in Farmer-ville. She stated that |ai Brian and the officers from the Farmerville Police Department would not allow her to take the children when she left Brian. Chief Coul-bertson testified that he told Yadaira that he and his officers “could not take the kids from [Brian] to give to her.” Yadaira also unequivocally testified that she did not have a job in Louisiana, but she remained in Monroe until Brian’s mother told her that she could no longer live with her. The trial court made no mention of the fact that Yadaira was prevented from taking the children with her when she left the home that she shared with Brian and his father.
As stated above, Brian testified that he and the children live with his retired father in a two-bedroom house. He also admitted that he and the children were totally dependent on his father for their financial needs. Brian also testified that he had only earned $1,800 since he moved from Memphis to Farmerville. As discussed above, Brian’s employment status remains unclear. He testified that he had a job at New Vision. Thereafter, he contradicted that testimony by stating that he had spoken to the superintendent of schools in Union Parish about a job as an athletic director. He also stated that he had applied for a position as a substitute teacher.
Additionally, the trial court largely declined to address Brian’s unwillingness to facilitate and encourage a close and com tinuing relationship between the children and Yadaira. Rather,- the court described the actions of both parents as “petty.” The record contains evidence that Brian has refused to answer the telephone when Yadaira calls. He has hung up on her during her conversations with the children.Further, he places the telephone on speaker .phone and “unintentionally listens .to the conversations. Initially, | ¡.¡¿Brian testified that Yadaira only contacts: the children once a month. On cross-examination, he admitted that Yadaira calls the children “frequently, if not daily.” Brian also admitted that he refused to allow the children to visit Yadaira at her hotel when she returned to the area for the March 9, 2015 hearing. Further, when Yadaira returned to Farmerville for their son’s kindergarten graduation, Brian would not allow the children to visit with her because she arrived one day early. According to Brian, he did not want to “confuse” the children.
Perhaps -what is most troubling is the trial court’s failure to address the allega-^ tions of domestic abuse. Yadaira testified that Brian had a history of physically, verbally and emotionally abusing her and that she chose to leave Farmerville and not return because she did not “feel safe.” Brian did not deny the allegations of domestic abuse. Rather, he testified that he did not recall the incidents of abuse. Additionally, the day that Yadaira left the *684 home in Farmerville, Brian admitted that he “grabbed” Yadaira by her arms. When questioned about the bruises on Yadaira’s arms, Brian responded, “[S]he bruises easily.”
We are mindful that the trial court has vast discretion in deciding matters of child custody. We are also mindful that Yadaira has not filed a Notice of Relocation, as required by LSA-R.S. 9:355, et seq. However, after reviewing this record, we find that the trial court erred in designating Brian as domiciliary parent. Our review of the record convinces us that Brian did not meet his burden of proving that he his capable of providing the children with their basic material needs,- independent of his | ^father's generosity. Consequently, we find that the interests of justice and the best interest of the minor children require that we remand this matter to the trial court for a determination of custody based upon a current presentation of the facts, particularly regarding Brian’s capacity to provide the minor children with their basic material needs, independent of his aging father.
CONCLUSION
For the foregoing reasons, the trial court judgment awarding domiciliary custody to Brian Lowe is reversed. This case is remanded to the trial court for an evi-dentiary hearing to determine which party should be awarded domiciliary custody of these -children. The court should consider the best interest of the children, taking into consideration the factors set forth in LSA-C.C. art. 134. Costs- are to be shared equally by the parties, Brian Lowe and Yadaira Lowe.
REVERSED; REMANDED.

. Brian was terminated from his position ■ with the Memphis Grizzlies professional basketball team due to an allegation of embezzlement. He.agreed to repay the monies and , criminal charges were not filed.

. DART is a non-profit organization. Its mission is to provide services including critical emergency shelter for abused and endangered residents of Lincoln, Bienville, Claiborne, Union, Jackson, Grant, and Winn Parishes. The purpose of DART is to serve the needs of domestic violence victims in its seven-parish area.

. Brian’s mother did not testify at the hearing.

. The testimony provided at subsequent’ hearings belied the allegation that Brian did not know Yadaira’s whereabouts. Yadaira testified that she had owned the house in Florida since before.-she married Brian, and he knew the address. Additionally, the evidence established that on fce day the petition was filed, at Yadaira’s request, Brian had taken the children to visit with her at a friend's home in Memphis.

. Brian’s testimony about that event was quite inconsistent. First, he testified that he would not allow Yadaira to visit the children because he had made plans to take them to *677 the circus. He later admitted that he and the children attended the 2:00 p.m. circus and were back at home by 6:00 p.m. Next, Brian testified that he and the children were asleep when Yadaira arrived. He later stated that the children were awake but they were dressed in their pajamas.

. The parties also testified with regard to other incidents in which Brian refused to allow Yadaira to communicate with the children via telephone. Yadaira testified that Brian would either refuse to answer the phone or he would disconnect the phone call while she was talking to the children. Brian denied intentionally disconnecting the phone calls. ' However, he admitted that he would place the phone calls on speakerphone when Yadaira called to talk to the children.

. Dr, Cannon is the superintendent of the Union Parish school system.

, The judgment provides, in pertinent part:
⅜ ⅜ ⅜
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Yadaira Lowe may have visitation with the minor children in the State of, Louisiana for any three (3) day period and she must give Brian Lowe at least seven (7) days advance notice of her intent to exercise said visitation. This visitation will take priority over any plans that Brian Lowe has with/for the minor children.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Yadaira Lowe shall havé custody of the minor children during ' the summer from July 4th until two weeks before school commences.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Yadaira Lowe will have visitation with the minor children the week of Thanksgiving from the Saturday ' preceding Thanksgiving Day to the Saturday after the Thanksgiving Holiday.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Yadaira Lowe will
have visitation with the minor children during the Christmas Holidays from the Saturday after the last day of school is out until 2 p.m, on Christmas Day.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Yadaira Lowe will have visitation with the minor children during Spring Break from the Saturday after the last day of school is out until the following Saturday.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the parent without the children will travel to pick up the minor children from the McDonald’s located nearest to the parent who has the children to facilitate the above visitation times. This does not apply to the three (3) day visitation(s) that will take place within the State of Louisiana as noted above. ’
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the use of Skype is encouraged between the parties.
[[Image here]]

. LSA-C.C. art. 134 provides, in pertinent part:
Such factors may include:
(1) The love, affection, and other emotional ties between each-party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment. .
(5) The permanence, as a family unit, of the existing or. proposed custodial home or homes.
(6) The morral fitness of each party, insofar as it affects the. welfare of the child.
(7) The mental and physical health of each party.
(8) The hotne, school, and community history of the child.
(9) The reasonable preference of the. child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness an,d ability of each party to facilitate and encourage a close and .continuing' relationship between the child and the other party.
(11), The, distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.

. Brian introduced into evidence a letter from the director of New Vision. The letter stated that Brian "had been hired.” However, the letter did not indicate the term for which Brian was hired or whether the position was permanent or temporary.

. Further, Brian's testimony regarding how he acquired the position at New Vision is improbable, at best. He stated that he had known the director of the school for several years, and he mentioned to her that he needed a job to provide for his children. Brian testified that the director (of an elementary school) offered him a job — working with young children — without formally interviewing him, conducting a background check or inquiring about his employment history.