COX, J.
11 This appeal arises from a judgment signed on August 19, 2016, from the Fourth Judicial District Court, Ouachita Parish, the Honorable Alvin R. Sharp presiding. Hope Barker Singleton, now Hope Barker Moore (“Mrs. Moore”), appeals from the judgment which denied her request to relocate with her son from Oua-chita Parish to Montgomery, Texas,[1] arguing that the court committed legal error in weighing the factors .required by La. R.S. 9:355.14 and abused its discretion in finding that the move was not in the minor child’s best-interest. For the following reasons, we find that the trial court did not commit legal error in weighing the factors required by La. R.S. 9:355.14. We affirm the ruling of the trial court.
FACTS
Mrs. Moore married Johnny Singleton (“Mr. Singleton”) on January 19, 2002, and one child, R.S., was born of the marriage on August 8, 2006. Mrs. Moore filed for *1136 divorce in 2009, but the parties reconciled following roughly six months of separation. On August 2, 2011, they separated again. The final divorce was granted on November 30, 2012.
On October 25, 2012, the parties entered into a consent judgment that awarded joint custody and named Mrs. Moore as the primary domiciliary parent. The judgment allowed Mr. Singleton visitation every other weekend and every Wednesday night. It also set child support at $900.00 per month and required written notification of either parent’s plan to relocate at least 60 days before moving, along with compliance with applicable law.
lain a letter sent by certified mail and dated March 27, 2015, Mrs. Moore attempted to notify Mr. Singleton that she intended to relocate with R.S. to Montgomery, Texas, so that she could live with her new husband. The letter was received by Mr. Singleton on March 31, 2015. Mrs. Moore stated that she also personally informed Mr. Singleton of the proposed relocation. She sent a second letter expressing the same intent by certified mail on April 28, 2015, and it was received on May 5, 2015.
Mrs. Moore filed a petition for relocation on May 19, 2015, asking the court’s permission to relocate with the child. She requested an expedited hearing under La. R.S. 9:355.10, seeking permission to temporarily relocate. Her request was denied. The parties were ordered to attend a hearing officer conference on July 21, 2015.
The hearing officer filed a conference report on July 23, 2015, recommending that the request to relocate be denied. On February 20, 2016, Mr. Singleton filed a motion to reduce child support because he had been laid off his job and unemployed since September of 2015.[2]
A trial on the relocation of the child was held over the course of 8 days in May, June, and July of 2016. On July 20, 2016, the trial court interviewed the minor child. After taking in all the testimony, the trial court issued written reasons for its ruling on August 8, 2016, and filed a judgment in accordance with its written reasons on August 19, 2016.
The trial on this matter began with an agreement that La. R.S. 9:355.14 was controlling. Testimony started with' Kayla May, a career law | ¡¡clerk for District Judge Robert James of the Western District of Louisiana. May testified that she knew both Mrs. Moore and Mr. Singleton because she attended the same church as they did while they were married.
May recalled going to a basketball game on approximately March 1, 2016, at the West Monroe Recreation Center to watch her son play. She arrived early while the prior game was still in progress and saw R.S. was one of the children playing. She recalled that when she sat down in the bleachers, she saw Mr. Singleton in the opposite bleachers “standing up and screaming down the court something about a foul.” She stated that at first, she could not decide who he was screaming at, but then R.S. committed a foul, and Mr. Singleton began screaming at him. May observed that R.S. appeared teary-eyed and looked upset about the screaming. R.S. was taken out of the game. May observed Mr. Singleton go over to him and get “down in his face.” She stated that “it appeared to [her] that he was yelling and he got him by the back of the neck and shook him.” This incident caused an older man, believed to be Mrs. Moore’s father, to *1137 come down from the stands along with an employee of the recreation center to talk to Mr. Singleton. May then observed Mr. Singleton walk away and exit the building. May stated that Mr. Singleton “seemed unreasonably upset,” “his reaction seemed odd,” and “he appeared to [her] as if he might have been under the influence of something.”
On cross-examination, May admitted that she saw Mr. Singleton at one of his son’s games in February and nothing inappropriate happened there. She also explained that all the bleachers were on one side of the gym so her view of the incident was lateral. May conceded she had no evidence that Mr. Singleton was intoxicated or on drugs.
RAndrell Cooper, an attorney at Centu-ryLink, was the next witness called. She testified that she had known both Mrs. Moore and Mr. Singleton for approximately five years through their sons playing baseball together. She stated that Mrs. Moore had always been attentive and is always with R.S.
Cooper observed that Mr. Singleton had been around more within the past year, attending all of the baseball games for the most recent season, but sporadically in the baseball seasons prior to trial. She recalled one particular game in Shreveport where she saw Mr. Singleton yelling and standing over David Cody Moore (“Mr. Moore”).[3] Cooper stated that she did not see the beginning of the argument or know what it was about, but Mr. Singleton would not stop yelling at Mr. Moore.
On cross-examination, Cooper stated that Mr. Singleton had attended almost all of the baseball team’s practices with R.S. over the past year. She stated that they seemed to have a loving relationship.
Mr. Singleton was called to the stand next for cross-examination. In his discovery responses, Mr. Singleton had denied that his previous employer was based out of Houston, Texas. However, in his deposition testimony, Mr, Singleton stated that his previous employer was Synergy, and they were based out of Houston, Texas. At trial, Mr. Singleton testified that he was employed with them until August 12, 2015.
In his responses to interrogatories, Mr, Singleton denied abusing prescription drugs, but he testified at trial that he had taken hydrocodone, temazepam, and Xa-nax on two occasions. He also testified that on one ^occasion he took Vyvanse (an ADHD medication which is an amphetamine) without a prescription. He stated he had not taken any illegal drugs since 2009, and the last time he took prescription drugs was September 14, 2014, right after he got a DWI.[4] Based on pharmacy records, Mr. Singleton conceded it was possible he had prescriptions filled for 200 hydrocodone pills in September 2014 and stated, “I got way too many, I know that.” He testified that the medication was for back pain, but that he quit taking the medication “cold turkey” in September 2014, and his back had improved since that date.[5]
Regarding his DWI, Mr. Singleton stated that on August 10, 2014, he had R.S. over with one of his friends. Mr. Singleton passed out on the couch and stated it took a while for him to be woken up when Mrs. Moore stopped by to take the children to a birthday party. After Mrs. Moore left, Mr. Singleton went to see a girl in Ruston. He was pulled over around 6:00 p.m. after a *1138 Ruston police officer noticed he was swerving. State police responded, and Mr. Singleton testified that he blew into a Breathalyzer which returned a 0 BAC. He also did a urine test which indicated hydroco-done, Restoril, Vyvanse, and Xanax. The toxicology report was introduced at trial and indicated positive results for amphetamine, methamphetamine, hydrocodone, mizopam, temazepam, oxycodone, and oxy-morphone. .
Mr. Singleton testified that he and Mrs/ Moore had, both done cocaine and ecstasy. He admitted' that in 2009 he was arrested for conspiracy to ^distribute cocaine, but stated the case was later thrown out by the district attorney.
Mr. Singleton admitted he had taken Lortab and Restoril for 5 years. He testified that he first began using illegal drugs around the time he met Mrs. Moore.
•Mr. Singleton denied leaving his job at Progressive Global in 2014 after being requested to take a drug screen. His deposition testimony, however, reflected that he was terminated for failure to supply a drug test. Progressive requested the test because Mr. Singleton appeared impaired at a meeting.
Mr. Singleton admitted that when he' was 18 years old, he was caught stealing stereo-speakers out of a friend’s car and was charged with a felony count of theft. In 1988, he pleaded guilty to unauthorized use of a movable. In 2004, Mr. Singleton was arrested.jn Lincoln Parish for drunk and disorderly conduct, In 2009, he was arrested for the above-mentioned conspiracy to distribute cocaine.
Mr. Singleton also admitted he was arrested in 2014 for insurance fraud when he filed a false police report claiming that his Camaro was stolen from his home. He stated that he “had to” file the police report because his car was missing when he went to get it after the DWI. Mr. Singleton stated that almost a month later, he filed a report that his vehicle was stolen. OnStar was then able to find the vehicle which “was taken by a gas vendor that was trying—trying to deliver fuel.” Mr. Singleton eventually pleaded guilty to criminal mischief in April pf 2016, but stated that the only lie he told was that the car was stolen from his yard instead of from a store. . . .
• ^Regarding his son from a previous marriage, Dallas, Mr, Singleton stated Dallas smokes marijuana, and the two do not see each other often. Dallas is 19 years old. Mr. Singleton stated that he has left R.S. in Dallas’s care once or twice, but that Dallas was not using marijuana while watching R.S.
Mr. Singleton acknowledged that Mrs, Moore was his second wife, and that he gotten married a third time, on December 12, 2012, to Francine Lambert (“Francine”) and moved to El Reno, Oklahoma,[6] He was later divorced from Francine and moved back to Monroe in July 2018. While living in Oklahoma, Mr. Singleton testified that he would drive down to Monroe to see R.S., whenever he could. Upon moving back, Mr, Singleton moved in with a friend, Tina Gross, for a few mpnths. He testified that he now lives in a rental home and is engaged to Cristen Thompson..
Regarding his current employment, Mr. Singleton stated that he is currently “in layoff status,” but stated he has sent out about 2,000 resumes since August 2015 to look for, additional employment.
Next, Hope Crawford (“Crawford”), Mr. Singleton’s first wife, was called to the *1139 stand. Crawford testified that Mr. Singleton played a limited role in-their son’s life, rarely visiting, and only at Mrs. Moore’s behest when she was married to Mr. Singleton. She recalled an incident three or four years ago when she would not let Dallas and R.S. get in Mr. Singleton’s truck with him because he appeared to be intoxicated. She also stated that Mr. Singleton showed up at one of Dallas’s junior high basketball games and caused a scene. Although she denied that he ever became physically violent | swith Dallas, she stated that Mr. Singleton lost his temper with Dallas all the time. Crawford also testified that Dallas babysat R.S. on multiple occasions.
On cross-examination, Crawford testified that Dallas and R.S. have a brotherly relationship and have been involved in each other’s lives.
Upon examination- by the court, Crawford stated that relocating R.S. to Texas would probably not-have much of an impact on Dallas and R.S.’s relationship. She elaborated that she could .not imagine R.S. not living with Mrs. Moore because of how limited Mr. Singleton’s relationship with R.S. and Dallas was. Her conception was that Mrs. Moore wanted to relocate R.S. to be part of a new, stable family, and Mr. Singleton did not want him to relocate because it would be too difficult or inconvenient for him to interact with R.S. in Texas. She stated that she thought it would be feasible for Mr. Singleton to move to Texas to be closer to R.S. She viewed Mrs. Moore’s family as supportive, but did not think Mr. Singleton had a similar supportive network.
On redirect, Crawford testified to an incident that occurred in 2002 or 2003 where Mr. Singleton threw a baseball helmet at her when she tried to calm him down at a baseball game because he was angry that Dallas was not playing well. She also recalled an incident that occurred approximately-five years'earlier where Mr. Singleton pushed her to the ground when she tried to prevent him from taking Dallas because he appeared angry.
David Cody., Moore, Mrs. Moore’s new husband, was next to be. called to the stand. He testified that he married Mrs. Moore on March 8, 2014, and moved into their home in Montgomery, Texas, around June of 2015. While dating Mrs. Moore and before 'moving into the home, he stated that-he lived “full time” in an apartment in Houston and would come home on the ^weekends. He currently works as an engineer-for Hunt, Guillot, and Associates (“HGA”) in the Woodlands office.
Referring to the move, Mr. Moore stated he was “trying to quit being project based and staying gone all the time so [he] could be with [his] family.” He stated he was asked to’move in April 2015. His new job has placed him at a dedicated office where he can go home every night and has also increased his hourly billing rate. Mr. - Moore testified that he wants Mrs. Moore and R.S. to come live with him and that he loves R.S. like his-own son. He stated that they play sports ’ together and do “just what I consider a dad and a son would do together.” Mr. Moore stated he would be willing to adopt R.S. “in a heartbeat,” but clarified he was not trying to replace his natural father. He thought it was important for' R.S. and Mr. Singleton to have a relationship.
Mr. Moore acknowledged that, at times, Mrs. Moore had followed a two-week custody rotation with Mr. Singleton and that She encouraged R.S. to have a relationship with his father. He stated that once they learned of Mr. Singleton’s arrests and warrants, they decided to go by the custody judgment. Mr. Moore stated, however, that he did not have any concerns with R.S. *1140 spending time with Mr. Singleton “in his current situation with Cristen[7] around.”
Mr. Moore stated that he and Mrs. Moore had studied the school zones and crime rates to determine where to live in Texas. Their home is adjacent to a golf club and a yacht club. There is also an elementary school close to the neighborhood. The community is not gated, but there is a sheriff | inpatrol that is dedicated to the neighborhood. Mr. Moore testified that , there are plenty of sports opportunities for children in the area, including at least 5 different travelling baseball teams,
Mr. Moore testified that -Mrs. Moore was pregnant and due to have their child at the end of August. He stated that if Mrs. Moore moved to Montgomery with R.S., there would be no need for her to work outside the home, but she could if she wanted to.[8] He also stated he would be willing to help R.S. with any schoolwork and indicated he held a B.S. in.Civil Engineering.
Mr. Moore recalled one altercation with Mr. Singleton two weeks prior to the hearing where Mr. Singleton yelled and cursed at him and Mrs. Moore.' He testified that Mr,. Singleton was the aggressor and was threatening to use physical violence when they were walking in the parking lot at the baseball park. He believed that Mr. Singleton was mad because he and Mrs. Moore were taking R.S. back to Mrs. Moore’s home.
On cross-examination, Mr. Moore testified that no one told him he would have been terminated from HGA if he did not take the new job, but he “read between the lines”-and understood that he would not have a job if he did not take the offer. He conceded that he did not look for a new job in Ouachita Parish because he did not think he would make as much money. He stated that they sold the house in Monroe because they could not afford to pay two house notes. He admitted to selling the house before the issue of relocation was settled, but stated they did not know it would sell so fast. He | nacknowledged that he and Mrs. Moore could have potentially kept the house in West Monroe until they found out whether R.S. would be allowed to relocate.
Court resumed with the cross-examination of Mr. Moore on June 7, 2016. Mr. Moore conceded that all of R.S.’s family, friends, and teammates live in the Monroe area, but he stated that R.S. had met and begun to make friends with the neighbors in Montgomery. He also acknowledged that all of R.S.’s medical care and history was in the Monroe area. Mr. Moore agreed that R.S. is close to, loves, and usually enjoys spending time with his father.
Mr. Moore stated that it would be possible for him to comb back to Monroe from Montgomery almost every weekend to visit Mrs. Moore and R.S. However, he stated it would partially be in the best interest of R.S. to be relocated to Montgomery because it would financially be better for him and Mrs. Moore, and it would provide R.S. with the benefits of a larger city.
On redirect, Mr. Moore noted that although he had not been employed in Monroe, neither had Mr. Singleton. He pointed out that Mr. Singleton’s previous employers were out of Texas, Oklahoma, and Utah. He also pointed out that Mr. Singleton’s involvement with R.S. had increased significantly after the filing of the motion to relocate.
Next to take the stand was Kimberly Hope Barker (“Mrs. Barker”), Mrs. *1141 Moore’s mother. She testified that Mrs. Moore and R.S. had been living with her since August of 2015. She stated she has always had a close relationship with her daughter and R.S. She almost always attends R.S.’s school events, but can only remember Mr. Singleton ever having attended one.
| iaMrs. Barker recalled multiple occasions where Mr. Singleton yelled at her, R.S., or Mrs. Moore. She corroborated May’s testimony regarding the incident at R.S.’s basketball game, but further stated Mr. Singleton laid his hands on R.S. in a violent manner at the game along with slapping aside her arm and threatening her husband when he told Mr. Singleton not to lay his hands on them. Mrs. Barker also corroborated Mr. Moore’s testimony regarding the incident at the baseball game.
Mrs. Barker noted that Mrs. Moore was often open and receptive to any request Mr. Singleton made for more time with R.S., and she never spoke ill of Mr. Singleton to R.S. She stated that R.S. was sometimes disrespectful to Mr. Moore, but Mr. Moore never raised his voice to R.S. Mrs. Barker believed it would be positive if the Moores and R.S. could all live together as a family.
On cross-examination, Mrs. Barker conceded that R.S. has spent his entire life in Ouachita Parish. She acknowledged that R.S. did not have any family in Houston and that he had no friends there at the moment. She also acknowledged that she and her husband would not be able to be as involved as they were at the time in R.S.’s life, but she still thought that moving to Houston would be the best for her daughter and R.S. She stated that having Mrs. Moore and R.S. live with her was not ideal, but she would not kick them out.
Mrs. Barker agreed R.S. loves his father. She acknowledged R.S. does not want to move to Montgomery, and the proposition of moving made him upset. She noted Mr. Singleton had been more engaged in R.S.’s life since the relocation issue arose. Mrs. Barker stated she was more 11scomfortable with R.S. spending time with Mr. Singleton when Cristen was around.
With regard to Mr. Moore’s job, she testified that her husband also worked for HGA and there were no similar jobs for Mr. Moore in the area.
Regarding the incident at the baseball game, Mrs. Barker stated the disagreement occurred when Mrs. Moore decided to take R.S. back to Monroe between baseball games instead of letting him stay at a hotel with the rest of the team.
On redirect, Mrs. Barker related one more incident two or three years prior to trial where Mr. Singleton showed up at her house to bring R.S. over. She stated Mr. Singleton was severely intoxicated and had Dallas drive him home.
The court also examined Mrs. Barker, pointing out factors six, seven, and ten on its checklist, asking for her comments on those factors. Mrs. Barker stated that as to number six, Mr. Singleton’s morals, she thought they were “questionable.” She testified that she did not think Mr. Singleton had good moral character based in part on the way he would speak to Mrs. Moore and how it would make R.S. ask his father not to speak to her in that way. Regarding factor seven, Mrs. Barker stated that Mrs. Moore is physically and mentally sound, but Mr. Singleton’s emotions get the best of him and he has also had problems with his back. Regarding factor ten, Mrs. Barker stated Mrs. Moore had always been willing and able to facilitate a close relationship between Mr. Singleton and R.S. She also stated that she thought Mr. Singleton mostly encouraged R.S. to talk to his mother, but it is sometimes more difficult to get in contact.
*1142 | uThe court also asked Mrs. Barker for her opinion on keeping brothers' and sisters together. She stated that Dallas and R.S. do not live together, but do have a relationship which could be continued if R.S. moved away. Additionally, Mrs. Barker stated that she would have no concern about Mr. Moore parenting R.S. She believed Mr. Moore would be able to treat both R.S. and his expected daughter the same, despite R.S. not being his biological child.
On June 30, 2016, the court reconvened and a stipulation was entered into the record regarding what Mr. Raymond Barker, the father of Mrs. Moore, would testify about. The stipulation stated that a Mr. Jim Hughes in HGA’s Houston office had been recruiting Mr. Barker to run the drafting and design department in that office. An open offer for the position was on the table, but Mr. Barker was waiting to find out the outcome of the litigation before making a decision.
Mrs. Moore, the plaintiff, was the next witness called to the stand. She indicated she was living with her parents in Monroe, but she co-owned the three-bedroom, two-bath home in Montgomery with her husband. Mrs. Moore explained the sale of the former matrimonial domicile was necessitated after Mr. Moore’s new job because they could not afford two households. Her proposed visitation schedule would be for Mr. Singleton- to have R.S. two weekends per month and some holidays. She indicated she would prefer for Mr. Singleton to meet her halfway for exchanges. Additionally, she thought it might be good for Mr. Singleton to relocate to Houston. She did not know of any obstacles that would prevent him from relocating.
|1fjMrs. Moore stated she was asking to relocate R.S. to Montgomery, Texas, because her husband was relocated by his employer, and the relocation would be beneficial for all of them because it would allow them to be together as a family unit; additionally, her husband would make more money. She stated she did not initially look forward to moving, but that it would be best to be together as a family. She believed Montgomery would be a good, permanent place for R.S. because it is safe and has good schools. She also stated there were plenty of sports and recreational opportunities for R.S. in Montgomery as well.
After deciding to relocate, Mrs. Moore stated she sent two letters to Mr. Singleton about it and also told him in person. She stated he did not like the idea and did not want R.S. to move. - Mrs. Moore testified that after she told him, Mr. Singleton went to RiS.’s school, picked him up, and told R.S. about the proposed move before Mrs. Moore could say anything to R.S. She admitted R.S. had mainly expressed negative preferences for moving to Montgomery and did not doubt the letter from R.S. stating he did not want to move. However, she also stated that, at nine years old, she did not think R.S. was mature enough to understand the opportunities and costs associated with moving to Montgomery. She believed that, based bn her relationship with and knowledge of her son, he would be able to make friends and adjust well to living in Montgomery.
Mrs. Moore testified she was the primary parent encouraging R.S.’s spiritual growth by taking him to church both in Monroe and Montgomei-y. She indicated her extended family was willing, able, and actively engaged with R.S. In addition, she stated she was primarily responsible for helping R.S. with homework. Mrs. Moore stated that she would be able to continue I into provide R.S; with a stable home life and has been doing so since he was born. She did not believe the situation with R.S. being shuffled between Montgomery, her *1143 parents’ house, and Mr. Singleton’s house was in R.S.’s best interest.
She testified that she was currently working for United Home Care doing nursing care plans and was able to work remotely. She indicated she would continue to work for the same company in the same capacity if she moved. She indicated that she and Mr. Moore have a great marriage, and Mr. Moore loves R.S. and- enjoys spending time with him. She believed Mr. Moore to be a positive role model for R.S. compared to Mr. Singleton. She also believed Mr. Moore would treat R.S. in exactly the same way he would treat his own biological children.
Mrs. Moore recalled that Mr. Singleton had no permanent residence between August 2011 and February 2012. She testified Mr. Singleton moved to Oklahoma around the end of July 2012, after their separation but before their divorce was final, because he had proposed to a woman there. He married that woman on December 12, 2012, and would come back to visit R.S. for roughly one long weekend (4-5 days) per month. When Mr. Singleton moved back, Mrs. Moore allowed him to see R.S. and to keep him overnight for two weekends and two weeknights, as per the settlement. She noted that the custody agreement prohibits cohabitation with someone they are not married to while the child is' in the residence. She stated she only entered into the 2012 custody arrangement because Mr. Singleton was being difficult and dragging out the divorce proceedings.
Mrs. Moore stated she never denied Mr. Singleton the time he was entitled to and always encouraged R.S.’s relationship with his father. She | ^testified- that Mr. Singleton appeared to encourage her relationship with R.S., but he also displayed negative behavior, such as yelling at her or cussing at her in front of R.S. She corroborated the incident at the basketball game and stated Mr. Singleton later yelled at her-for not getting involved.
Mrs. Moore stated Mr. Singleton was not current on his child support obligation, having not paid for May or June of 2016. She also stated she bears the burden of providing private health insurance for R.S. and that Mr. Singleton has not helped with any uncovered medical costs.
Mrs. Moore stated she has a problem with Mr. Singleton’s moral character because “he continues to make poor choices and get in trouble with the law and do things that negatively ’affect both of his boys.” She stated that, in her experience as a registered nurse, she had never se'en anyone take 376 Lortab pills in a month and then quit “cold turkey.” Mrs. Moore thought of herself, on the other hand, as a morally fit, normal person. Regarding physical fitness, she stated that besides her pregnancy and diagnosis of gestational diabetes, she was in fine health. She noted Mr. Singleton’s bad back, but did not know of any other physical issues.
On July 6, 2016, the trial resumed with the cross-examination of Mrs. Moore. Mrs. Moore admitted her entire family lives in Ouachita Parish and R.S. has lived there his entire life.
On the issue of finances, Mr, and Mrs. Moore’s joint tax return was admitted into evidence showing that they made $156,466 in 2015. Mrs. Moore admitted Mr. Singleton was current on child support through April of 2016.
Mrs. Moore conceded that the proposed visitation schedule would have R.S. visiting his father two weekends per month and that the drive |isbetween Monroe and Montgomery would be approximately 5½ hours. The result would be R.S. .spending 11 hours in a car on those weekends. She admitted that although R.S. was used to *1144 travelling for baseball, it would not be easy on him.
Mrs. Moore admitted that Mr. Singleton had been present for much of R.S.’s recent activities, but she thought he was just putting on a show for the court. She testified there was once a period of two months where she did not even hear from Mr. Singleton. She stated that Mr. Singleton returned to R.S.’s life regularly around November of 2014 when he began dating Cristen. She believed that Mr. Singleton’s girlfriend had a good relationship with R.S. and was supportive of him
Mrs. Moore indicated she had never told R.S. about Mr. Singleton’s arrests or history. She admitted taking Ecstasy a couple of times when she was 19, but stated it was provided by Mr. Singleton. She also admitted she had known almost everything about Mr. Singleton’s history at the time of trial and still allowed him to see R.S. under the visitation schedule because he is a good father at times. She stated he is good when there is a woman in the picture, but then he moves on.
The court questioned Mrs. Moore as to why R.S. did not want to move to Texas. She stated it was because Mr. Singleton made him think he was being taken away from everyone and he would never see them again. Mrs. Moore stated R.S. was very important to her and that although he would see his current friends less if the move were allowed, she would make every effort to keep them in touch. She also stated she wanted R.S. to be part of a stable family with a good role model and father figure. She indicated she was always willing to let R.S. talk to his father on the phone.
IibMs. Cristen Thompson (“Ms. Thompson”) was next to take the stand. She testified that she lives with Mr. Singleton, her son Corey, and Dallas when he is around, in a rented three-bedroom, two-bath home in West Monroe. She indicated that she and Mr. Singleton were engaged to be married, but had not set a date because they were waiting for the litigation to end.
She testified that she always thought Mr. Singleton and R.S. had a good, strong relationship. She stated that for as long as she had known Mr. Singleton, since November 2014, she had never seen him do anything inappropriate with drugs or get intoxicated around R.S. She always saw him help R.S. with schoolwork and sports. She stated they have shouldered some of the burden financially to make sure R.S. can participate in sports. Additionally, she believed Mr. Singleton had always done a good job of encouraging R.S.’s relationship with his mother.
She stated that Mr. Singleton spanked R.S. once, but it was after Mrs. Moore called him to tell him that R.S. had been getting in trouble at school and asked him to “handle it.” She believed Mr. Singleton was very motivated to be a part of his son’s life because he did not have a father of his own. She stated that his involvement with R.S. was the reason he moved back from Oklahoma.
Ms. Thompson stated she and Mrs. Moore are friendly and they have conversations, but she had not seen Mr. Singleton and Mr. Moore have a conversation in two years. Ms. Thompson recalled a birthday party that they had for R.S. where Mr. Moore stayed away from Mr. Singleton, did not talk to him, and would not engage with him like the rest of Mrs. Moore’s family. She admitted that Mr. Singleton had said he did not like Mr. Moore.
|2nMs. Thompson testified that Mr. Singleton had been out of work for 9-10 months, so he had been even more involved in R.S.’s life by going to every game and practice. She stated Mr. Singleton was actively seeking new employment, but she was currently employed at Vantage Health *1145 Plans in the Accounting Department. She stated it would not be easy for them to move to Texas because both she and Mr. Singleton would have to find new jobs.
Ms. Thompson indicated that she and Mr. Singleton take R.S. to church and are making sure he does well in school. Ms. Thompson knew of at least two of R.S.’s close friends who she believed would have less contact if the move was allowed. She also thought R.S.’s close relationships with his extended family in Ouachita Parish would suffer.
Referring to the incident at the baseball park, Ms. Thompson stated that Mr. Singleton asked Mrs. Moore why they were leaving the night of the baseball tournament, and Mr. Moore responded by jumping up and yelling. She stated that Mr. Moore was being disrespectful of Mr. Singleton as R.S’s father.
On cross-examination, Ms. Thompson stated she was fully aware of Mr. Singleton’s history when she began seeing him. She stated that even though Mr. Singleton had been unemployed, he had money set aside that he spent, and she has picked up the “slack” since that ran out in March or April.
Upon examination by the court, Ms. Thompson testified that R.S. would “eventually fall apart when he can’t see his daddy” if the move to Texas were allowed. She stated she did not mind helping Mr. Singleton through his money problems because they were a team, and he needed to be home to deal with everything and be a part of R.S.’s life. She also stated Mr. Singleton had never threatened her or hit her, and she had never seen |glMr. Singleton abuse R.S. She indicated that sometimes Mr. Singleton gets mad and “hollers” at R.S., but is never belligerent.
Mr. Singleton was the next witness on the stand. He testified that he planned to marry Ms. Thompson, and they were waiting for the litigation to end before they got married. He stated that in 2014 he earned around $103,000, and he saved money to live on before he was laid off in 2015. Mr. Singleton also stated he was looking for work and had been offered “residential positions in chemical plants,” but had not had any offers on “the drilling side.”
Mr. Singleton testified that he had always provided for his son and never missed any child support payments, although he acknowledged he’ had not paid for the past two months. Mr. Singleton stated he had always been active in caring for R.S. and has tried to make sure he maintains a positive attitude.
Referencing the testimony about the basketball game, Mr. Singleton stated that R.S. “had a bad game,” and he was fouling people and not playing well. When R.S. sat down, Mr. Singleton said he thought R.S. was going to get up and walk off so he sat him back down and talked to him. Mr. Singleton claimed he was disciplining his son for bad behavior. Turning to the baseball park incident, Mr. Singleton stated that R.S. did not see the incident, and it would not have happened “if they hadn’t have took my son back to Monroe after he hit a homerun that day and let him celebrate with the team at the hotel like we’ve always done.” He testified that he felt he and Mr. Moore were not friends, and Mr. Moore despised him.
Mr. Singleton stated he and R.S. practice some aspect of sports almost every day. He stated that during the school year he always has R.S. do his |aahomework before anything else. Mr. Singleton said R.S. has the maturity of a typical 9-year-old child, and R.S. has told him he does not want to move and has been upset by it.
In response to testimony about him calling R.S. fat, Mr. Singleton stated R.S. had complained about his feet hurting, so he looked up average weights for children his age and saw that he was over that. He told *1146 R;S. if he wanted to run faster, he would help him lose weight and that might help his feet.
Mr. Singleton said he appreciated that Mrs.'Moore let him talk to R.S. and text him frequently. He testified that he works his schedule around' making it to R.S.’s sporting events as much as possible and has spent a lot of money on sports equipment for him. He stated that even though he was laid off, he paid for everything he could and stated he could provide-for R.S.
Mr. Singleton stated that R.S.’s school is near his home, and he has no plans to move. He testified that all of R.S.’s extended family are relatively close to Monroe, and he does not know of any such family in Texas. He stated he could not see a positive in the move to Montgomery, He also did not think it would be possible for R.S. to play sports in the same way if he had to move.
Regarding his drug history, Mr. Singleton stated he had not taken any illegal drugs or abused any medication since his-arrest in 2014. He stated he got off hydro-codone by choice because he did not want to take medication.
Ón redirect, and a few days after his original testimony, Mr. Singleton stated he and Ms. Thompson were planning oñ getting married on the upcoming Sunday, just two days away. He explained that Ms. Thompson had sat him down, and they talked and decided they should have done it alaswhile back because they do not want a life without R.S. At the time, they had already .received a marriage license. When asked what had changed, Mr. Singleton stated “we felt the court would frown on us not being together and us not being married and we wanted to show the court that we are a family, that [R.S.] has a stable home,' that [R.S.] does thrive at our house.”
The court examined Mr. Singleton, asking why not allowing the relocation would be in R.S.’s'best interest: Mr. Singleton stated'the relocation would affect everyone in R.S.’s' life, but if he did not move, it would only affect Mr. Moore. He also did not think that Mr. Moore .had R'.S.’s best interests at heart because he was going to take R.S. without talking to Mr. Singleton about the move. Mr. Singleton testified that R.S. did not want to go to Houston, and he was scared he would not be able to see people 'in his 'life anymore. He stated R.S. is a good student who loves his dad and is happy where he is.
The court also questioned Mr. Singleton on why he got up and interrupted Mr. Moore while he was on the stand and what he meant when he said, “You’re getting real close now.” Mr, Singleton admitted that he meant Mr. Moore was getting closer to getting ,his a** whooped. He explained he. was angry because Mr. Moore was the man trying to take his son away from him and was saying bad things about him on the stand.
Mrs. Moore was called as a rebuttal witness after Mr. Singleton’s examination. Mrs. Moore stated that Mr. Moore feels the way he does about Mr. Singleton because of the way-Mr. Singleton has been rude and inconsiderate to him.
la/The court conducted a Watermeier hearing with the child’ to determine R.S.’s preference regarding the proposed relocation. In the interview, the child indicated that he would prefer to remain in Monroe.[9]
The court issued its reasons for judgment on August 8, 2016, and a final, signed judgment on August 19, 2016. In its rea *1147 sons for judgment, the court noted that the hearing officer conference originally found that relocation was not in the best interest of the child. The court noted that the applicable statute, La. R.S. 9:355.14, required consideration of various factors and addressed them in turn.
The court found Factor 1 was equal between the parties. It found Factor 2 slightly favored the father because the child’s “educatiorial preferences and history” were completely based in Ouachita Parish and not Texas. Factor 3 was found to slightly favor the father because the feasibility of preserving the relationship with the father was not manifestly apparent. Factor 4 was found to favor the father based on the Watermeier inquiry where the child did not think going to Texas would be best. Factor 5 was found to be equal. Factor 6 was originally determined to favor the mother for financial stability, but “the emotional benefit and educational opportunity seemed to swing this factor back to slightly favor the father.” Factor 7 was found to be equal, as the reason for the move would be family unity, but the move would also destroy the relationship with the father. Factor 8 was found to clearly favor the mother because of her employment. Under Factor 9, the court found the father to be “in basic compliance with his financial | ⅞,-,obligations.” Considering Factor 10, the court determined that it was not feasible for the father to relocate. The court found that both parties had engaged in “substance abuse (to some degree),” and were thus equal under Factor 11. Finally, the court found that after considering the Article 134 checklist, Factor 12 favored the father. As a result, the court determined that relocation was not in the best interest of the child.
Mrs. Moore appeals from this ruling.
LAW
The relocation statutes govern the relocation of a child’s principal residence outside the state. Gathen v. Gathen, 2010-2312 (La. 5/10/11), 66 So.3d 1. A person proposing relocation of a child’s principal residence shall notify any person recognized as a parent and any other person awarded custody or visitation under a court decree. La. R.S. 9:355.4. Notice of the proposed relocation shall be given by registered or certified mail, return receipt requested, or delivered by commercial courier to the last known address of the person entitled to notice no later than the .sixtieth day before the date of the proposed relocation. La. R.S. 9:355.5.
Pursuant to La. R.S. 9:355.13, the relocating parent has the burden of proving that the proposed-relocation is (1) made in good faith and (2) in the best interest of the child. In reaching its decision, regarding a proposed relocation, the court shall consider all relevant factors in determining whether relocation is in the best interest of the child, including the following:
(1) The nature, quality, extent of involvement, and duration of the relationship of the child with' the person proposing relocation and with the non-relocating person, siblings, and other significant persons in the . child’s life.
(2) The age,- developmental stage, needs of the child, and the Unlikely impact the relocation will have on the child’s physical, educational, and emotional development.
(3) The feasibility of preserving a good relationship between the non-relocating person and the child through suitable physical custody or-visitation arrangements, considering the logistics and financial circumstances of the parties.
*1148 (4) The child’s views about the proposed relocation, taking into consideration the age and maturity of the child.
(5) Whether there is an established pattern of conduct by either the person seeking or the person opposing the relocation, either to promote or thwart the relationship of the child and the other party.
(6) How the relocation of the child will affect the general quality of life for the child, including but not limited to financial or emotional benefit and educational opportunity.
(7) The reasons of each person for seeking or opposing the relocation.
(8) The current employment and economic circumstances of each person and how the proposed relocation may affect the circumstances of the child.
(9) The extent to which the objecting person has fulfilled his financial obligations to the person seeking relocation, including child support, spousal support, and community property, and alimentary obligations.
(10) The feasibility of a relocation by the objecting person.
(11) Any history of substance abuse, harassment, or violence by either the person seeking or the person opposing relocation, including a consideration of the severity of the conduct and the failure or success of any attempts at rehabilitation.
(12) Any other factors affecting the best interest of the child.
La. R.S. 9:355.14(A). The court may not consider whether the person seeking relocation of the child may relocate without the child if relocation is denied or whether the person opposing relocation may also relocate if relocation is allowed. La. R.S. 9:355.14(B).
The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
⅛(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and, encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
La. Civ. Code art. 134.
The question on appellate review is whether the trial court, having properly *1149 considered all of the factors in La. R.S. 9:355.14, abused its discretion in determining that the relocation would not be in the child’s best interest. Gray v. Gray, 2011-548 (La. 7/1/11), 65 So.3d 1247. “A trial court’s determination in a relocation matter is entitled to great weight and will not be overturned on appeal absent a clear showing of abuse of discretion.” Gathen, supra.
A court of appeal may not set aside a trial court’s findings of fact in the absence of manifest error or unless they are clearly wrong. Allerton v. Broussard, 10-2071 (La. 12/10/10), 50 So.3d 145. In order to reverse a trial court’s determination of fact under the manifest error standard, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is manifestly erroneous or clearly 12¿wrong. Id. Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Id.
However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record. Evans v. Lungrin, 97-0541 (La. 2/6/98), 708 So.2d 731. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Id. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. Id.
DISCUSSION
After reviewing the record, we find that the trial court did not commit legal error in weighing the factors required by La. R.S. 9:355.14, and de novo review of the record is not required. The trial court applied the correct principles of law in this case, applying the factors required under La. R.S. 9:355.14. Additionally, the factors under Civil Code Article 134 were weighed to determine the best interest of the child. The application of these factors did not materially affect the outcome of this ease, nor did it deprive either party of substantial rights.
The manifest error standard is thus applicable, and we find that the trial court was not manifestly erroneous in denying Mrs. Moore’s request to relocate with her son from Ouachita Parish to Montgomery, Texas. Although we do not agree with the manner in which some factors were weighed, we do not find the trial court abused his discretion in applying the ^factors under La. R.S. 9:355.14 and Civil Code Article 134 and in finding that relocation was not in the overall best interest of the child.
In its reasons for judgment, the trial court first analyzed and weighed the factors required under La. R.S. 9:355.14. Factor one—the nature, quality, extent of involvement, and duration of the relationship of the child with the person proposing relocation and with the non-relocating person, siblings, and other significant persons in the child’s life—was found to be equal between the parties. Both parents have been involved in R.S.’s life and have a good relationship him. We find no manifest error in deciding this factor was equal.
Factor two—the age, developmental stage, needs of the child, and the likely impact the relocation will have on the child’s physical, educational, and emotional development—was found to slightly favor the father because the child’s educational preferences and history rested in Ouachita Parish. R.S. is now ten years old. He has lived and gone to school in Ouachita Parish his entire life, where he has been involved *1150 in extracurricular activities and has made friends. During the Watermeier inquiry, R.S. stated-- he did not want to move and ■leave all of that behind. Therefore, we do not find the trial court was manifestly erroneous in determining this factor favored the father.
' Factor three—the feasibility of preserving a good relationship between the non-relocating person and the child through suitable physical.custody or visitation arrangements, considering the logistics and financial .circumstances of the parties—was also found to slightly favor the father. The trial court believed the feasibility of R.S. preserving a good relationship with his father would not be manifested if relocation was granted. During |antrial, Mrs. Moore suggested a visitation schedule that would allow Mr. Singleton to have R.S. two weekends per month and some holidays. She stated she would prefer for Mr. Singleton to meet her halfway for the exchange. The distance between Ouachita Parish and Montgomery, Texas, is 5½ hours. This would require R.S. to spend nearly 11 hours in the car on weekends he went to visit his father, leaving him little time to enjoy the visit. With regard to financial circumstances, Mr. Singleton has been unemployed since 2015, but is currently looking for employment. The trial court was not manifestly erroneous in determining that if relocation was allowed, it would not be feasible for R.S. to preserve a good relationship with his father.
Factor four—the child’s views about the proposed relocation, taking into consideration the age and maturity of the child— was found to favor the father. During the Watermeier hearing, R.S. expressed his desire to-stay in Ouachita Parish. At this time, R.S. was nine years old. A trial judge’s decision in - a custody matter is entitled to great weight, and it appears the trial court felt R.S. was of an appropriate age and mature enough to have his preference considered. In its reasons for judgment, the trial court stated R,S.’s reasons for not wanting to move “were sound and well articulated.” Thus, we find no manifest error in the trial court’s determination.
Factor five—whether there is an established pattern of conduct by either the , person seeking or the person opposing the relocation, either to promote or thwart the relationship of the child and '' the other party—was found to be equal between the parties. The trial court noted that there only appeared to be mutual “promotion manifestations” in this case, and we agree.
| S1 Factor six—how the relocation of the child will affect the general quality of life for the child, including but not limited to financial or emotional benefit and educational opportunity—was found to slightly favor the father. Although the trial court pointed out Mrs. Moore’s financial benefits with her husband’s new income, the court believed the emotional benefit and educational opportunity outweighed any financial benefit. As stated above, RiS. did not want to move to Texas. Additionally, he has attended school in Ouachita Parish his entire life. We do not find that the trial court was manifestly erroneous in this determination.
Factor seven—the reasons of each person for seeking or opposing the relocation—was found to be equal between the parties. Both parties have sufficient reasons for seeking and opposing the relocation. We agree with the trial court’s determination regarding this factor.
Factor- eight—the current employment and economic circumstances of each person and how the proposed relocation may affect the circumstances of the child—was found to favor the mother. We agree with this finding, as the mother is employed and Mr. Singleton has been unemployed since 2015.
*1151 Factor nine—the extent to which the objecting person has fulfilled his financial obligations to the person seeking relocation, including child support, spousal support, and community property, and alimentary obligations—was . only briefly considered. The trial court stated that Mr, Singleton was found to be in “basic compliance” with his financial obligations. Although Mr. Singleton had not paid child support for the last two months at the time of trial, he had made all other support payments up until that time. We cannot find that the trial court was manifestly erroneous.
IsgFactor ten—the feasibility of a relocation by the objecting person—was also only briefly considered. The trial court stated that it was not feasible for Mr. Singleton to relocate to Texas at the time. As mentioned above, Mr. Singleton has been unemployed since 2015. He stated he is currently searching for a job in the Ouachita Parish area. Additionally, he lives with his new wife, Cristen, in Ouachita Parish. We do not find manifest error'in the trial court’s determination. ■
Factor eleven—any history of substance abuse, harassment, or violence by either the person seeking or the person opposing relocating, including á consideration of the severity of the conduct and the failure or success of any attempts at rehabilitation— was found to be equal between, the parties. Although Mr. Singleton’s history of substance abuse was more substantiál than Mrs. Moore’s, it was revealed at trial that Mrs. Moore had experimented with drugs on a few occasions in college. Additionally, Mr. Singleton testified he hád quit taking prescription pills. We cannot find manifest error in the trial judge’s determination.
Factor twelve—any other factors affecting the best interest of the child—leads us to the factors considered under Civil Code Article 134. The trial court used an Article 134 checklist for its analysis. Factors one, two, six, seven, and ten were found to be equal between the parties.
Factor three—the capacity and disposition of each party to provide the ’child with ■ food, clothing, medical care, and other material needs—was found to favor the mother. As stated above, Mrs. Moore and her husband both have jobs that provide' a steady income. Mr. Singleton has been unemployed since .2015. We agree with this finding.
• |asFactor four—the length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment—was found to favor the father. Although R.S. has primarily resided with his mother throughout his .life, they have lived in Oua-chita Parish. We cannot find manifest error in. the trial court’s determination.
Factor five—the permanence, as a¡family unit, of the existing or proposed custodial- home or homes—was found to favor, the father. For the same reasons listed under factor four, we cannot find manifest error.
Factor " eight—the home, school, and community history of the child—was fodnd to favor the father. R.S., who was nine-years-old at the time of trial, had lived and gone to school in Ouachita Parish is entire life. He is involved in sports and has many friends there. We agree with the trial court’s finding with regard to this factor.
Factor nine—the reasonable preference of the child, if the court deems the child .to be of sufficient age to express such a preference—was found to favor the father. As previously mentioned, the trial judge is awarded great discretion in these matters. It appears the trial court believed R.S. was of a sufficient age to express a preference and thus took it into consideration. R.S. wished to remain in Ouachita Parish and live with his father. We find no manifest error. . •
*1152 Factor eleven—the distance between the respective residences of the parties—was found to favor the father. As Mr. Moore is the party who proposed the relocation and the distance is 5 ½ hours between Ouachi-ta Parish and Montgomery, Texas, we cannot find manifest error in this determination.
|a4Overall, the trial court determined the relocation was not in the overall best interest of the child, based on the findings under La. R.S. 9:355.14 and Civil Code Article 134.
Unfortunately, this is a close case. However, we do not find that the trial court abused its discretion in applying the factors under La.’ R.S. 9:355.14 and Civil Code Article 134. Although we may have weighed some of the factors differently, this case did not warrant a de novo review, as no legal errors were committed and the correct principles of law were applied. The trial court’s findings showed that relocation was not in the overall best interest of the child. We find no manifest error in the trial court’s denial of Mrs. Moore’s request to relocate.
CONCLUSION
For the reasons stated above, we do not find that the trial court committed legal error in applying the factors under La. R.S. 9:355.14 and La. Civ. Code art. 134 and in finding the relocation was not in the best interest of the child. The trial court applied the correct principles of law in this case, and the trial judge is accorded great discretion. Absent manifest error, the trial court’s finding should not be overturned. Although this was a close case, we cannot find any manifest error in the trial court’s denial of Mrs. Moore’s request to relocate with her son from Ouachita Parish to Montgomery, Texas. We thus affirm the ruling of the trial court. The costs of this proceeding are assessed to the Appellant, Mrs. Hope Barker Singleton.
AFFIRMED.

. Montgomery, Texas, is in the Woodlands, a suburb of Houston. The drive between Montgomery and Monroe is approximately 5½ hours.

. At the outset of the trial on the relocation issue the court determined that it would also hear arguments on the child support issue; however, the final judgment only addresses the relocation issue.

. David Cody Moore is Mrs. Moore's new husband.

. The DWI occurred on August 10, 2014.

. Mr. Singleton stated his back problems stem from deterioration of his fifth and sixth or sixth and seventh lumbar vertebrae.

. Mr. Singleton stated he moved to Oklahoma in June 2012, while he was still married to Mrs. Moore.

. Cristen is Mr. Singleton’s fiancée.

. Mr. Moore's 2015 tax return showed that he made approximately $120,000,. and he testified that there was no reason to expect his income to be reduced in the coming year.

. It would appear that, due to the fact that the hearing was recorded on a cassette tape, much of the dialogue is not audible. However, that may also be due to the playback mechanism.