COX, J.
*672 In 2016, Appellant, Yadaira Lowe ("Yadaira"), appealed a judgment from the trial court granting her and Appellee, Brian Lowe ("Brian"), joint custody of their two minor children, with Brian being designated as the domiciliary parent. In the parties' first appeal of Lowe v. Lowe , 50,856 (La. App. 2 Cir. 5/18/16), 196 So.3d 672 (" Lowe I "), this Court was concerned with Brian's capacity to provide the minor children with their basic material needs, independent of his father, and remanded the matter to the trial court for an evidentiary hearing to determine which party should be awarded domiciliary status of the children. On remand, the trial court again awarded Brian domiciliary status. For the following reasons, we respectfully reverse the ruling of the trial court.
FACTS
In Lowe I , the pertinent facts were as follows:
The plaintiff, Brian Lowe ("Brian"), and the defendant, Yadaira Lowe ("Yadaira"), were married on September 3, 2005 in Orlando, Florida. They had two children, L.E.L., who was born on July 18, 2009, and L.G.L, who was born on November 23, 2011.
In 2013, Brian was terminated from an administrative position in Memphis, Tennessee. Having no financial resources, in February 2014, the parties and their young children moved to Farmerville, Louisiana, to live with Brian's father. At the time of the move, Brian was hoping to gain employment as the athletic director at Grambling State University ("GSU").
On July 15, 2014, a domestic dispute ensued between Brian and Yadaira, which resulted in Yadaira calling the Farmerville Police Department.... Yadaira left Farmerville after the incident involving the police. Because she did not have anywhere to live in Farmerville, she went to live with Brian's mother in Monroe. Yadaira testified that she remained in Monroe for approximately two weeks. Thereafter, Brian's mother informed her that she could no longer live with her. Having no place to live in Louisiana, Yadaira returned to Kissimmee, Florida, where the home she owned before she married Brian is located.
On November 24, 2014, Brian filed a petition for divorce. He requested to be designated as the primary domiciliary parent of the minor children... A hearing was conducted on March 9, 2015. The testimony at the hearing revealed Brian was unemployed and financially dependent on his father, a 67-year-old retiree.
At the conclusion of the hearing, the trial court granted domiciliary custody to Brian... The court also expressed its concerns with regard to Brian's unemployed status and financial dependence on his father. The court stated:
I'm somewhat skeptical about his job prospects if he's going to continue to pursue a job as [Athletic Director] at Grambling State University, and if you can't show to the Court that you can support your own family, then I'm going to reconsider this because apparently, Ms. Lowe is able to provide for her children without the assistance of-without the type of assistance, total dependency that you have right now. For that reason, we have agreed that we will have a hearing on this to look at the situation on June the 19th.
The second hearing was held as scheduled. Brian testified that he had been hired as the physical education instructor at the New Vision Learning Academy, an elementary charter school in *673 Monroe. On cross-examination, Brian testified that he had been working at New Vision for approximately two weeks... He admitted that he had known the director "for several years." He testified that he told the director that he needed a job, and she hired him immediately without interviewing him for the position. Brian further admitted that he did not tell the director the reason he was terminated from his job in Memphis and he admitted that he did not believe he would be able to maintain his position at New Vision if the administration discovered the reason he was terminated in Memphis. Further, Brian admitted that he had not been hired for the position at GSU. He stated that, although he had been pursuing the position for more than a year, he had not told the university officials about the embezzlement allegation.
Brian further testified on cross-examination as follows: ... he had not earned any income since the prior hearing; he had not received a paycheck from New Vision; and, his father continued to provide for the children.
On redirect examination, Brian testified that since the March hearing, he had conducted a week-long football camp and earned $1,500. He also stated that he conducted a three-day consulting project at a charter high school in Monroe, after which he earned $300.
Yadaira testified first on cross-examination. She testified as follows: she was employed as a clerk in a school nutrition department for the Osceola School District in Kissimmee; she sent Brian $300 in child support in April; her mother is willing to move to Kissimmee to assist her with the children; she has an aunt and a cousin in Kissimmee.
When questioned about the status of her ability to co-parent with Brian, Yadaira admitted that she does not believe Brian will foster a relationship between the children and her if he is awarded domiciliary custody. She testified that Brian hangs up during her phone calls to the children.
At the conclusion of the hearing, the trial court awarded joint custody and designated Brian as the primary domiciliary parent, stating:
It basically all comes down to the fact [that] the children are here in Louisiana[.] [T]hey have a fairly stable home. [Mr. Lowe has] the possibility of a good job at Grambling, and [he has] a pretty good support system here from everything I've heard. The children are here. And, Ms. Lowe, I can appreciate your feeling that you are trapped if you stay here in Louisiana and you probably had no choice but to move to Florida; but the fact is they are here in Louisiana and if I allow you to take them to Florida, then by your moving to Florida, you're taking the children away from their dad. And for that reason, I will name Mr. Lowe as the primary domiciliary parent.
On the first appeal, this Court found that the trial court erred in designating Brian as domiciliary parent. The Court stated that Brian did not meet his burden of proving he is capable of providing the children with their basic material needs, independent of his father's generosity. The matter was reversed and remanded to the trial court for a determination of custody based upon a current presentation of the facts, particularly regarding Brian's capacity to provide the minor children with their basic material needs, "independent of his aging father."
On remand, the parties agreed that the only evidence to be considered by the trial *674 court was the current employment and economic situation with regard to Brian.
Adriel Hilton, Ph.D., Chief of Staff and Executive Assistant to the President of Grambling State University ("GSU"), was the first to testify. He testified that GSU planned to eventually hire Brian as an Associate Vice President for Advancement to fundraise for athletics. Hilton testified that there was reservation on GSU's behalf to hire Brian because of his familial relationship to the football coach. However, the role of Associate Vice President for Advancement allows Brian to report to the Vice President for Advancement instead of managing his family member.
When questioned about the Eddie Robinson Classic, Hilton stated that Brian "developed it." When asked if Grambling and Brian were compensated for the Classic, Hilton responded that GSU is only compensated in terms of enrollment of students. Hilton also stated that Brian was assisting with marketing for the Bayou Classic. However, he stated Brian is not compensated for his work.
Hilton was also questioned about the Adidas apparel deal. He stated that Brian and his company, TeamUp Sports, will be compensated. Hilton described the deal as an opportunity for the football team to move from Russell to Adidas brand apparel and equipment. On cross-examination about the Adidas contract, Hilton also conceded that none of the SWAC schools have been allowed to enter into any of these types of contracts to date.
On cross-examination, Hilton conceded that his position as Chief of Staff to the President of GSU is in limbo, as the president may resign or be terminated pending current board meeting discussions. If this happens, Hilton stated that the new president would likely hire his own team.
Finally, Hilton testified that GSU does not have the funds available to extend Brian the Associate Vice President for Advancement position at the salary promised to him, which was a minimum of $100,000.
With regard to his company, TeamUp Sports, Brian testified that it made money in 2015 and 2016. He stated he was also compensated in 2015 for his work with the Eddie Robinson Classic, stating he earned a little over "fifteen, sixteen thousand dollars" after expenses. Brian stated he was not compensated for the Bayou Classic.
Regarding the Adidas deal, Brian stated he would be compensated if GSU was able to enter into an agreement with Adidas. Additionally, he testified he was putting on a gala for which he would be compensated. Brian also testified he recently secured a sponsorship with Whataburger for $2,000.
Brian's 2015 tax return form W-2 showed he received $3,039.71 from New Vision Learning Academy. His total income for 2015 was $16,358. In November and December 2015, Brian made deposits amounting to $20,500. The following month, he made deposits totaling $17,200. From March to April 2016, Brian deposited $5,500. From April to May, he deposited $9,956.98. At the end of May 2016, Brian's account balance was $7,478.03.
Brian testified that he recently entered into a contract with Firmus Laboratory "as [a] marketing person that's responsible for business development in this region." He stated that the company does "all the specimen through different insurance platforms with healthcare companies all across." He testified that he receives $25 for every specimen that is made. At the time of trial, however, Brian had not received any money from the company.
On cross-examination, Brian reiterated that he received $15,414 from cash ticket sales for the Eddie Robinson Classic. He *675 stated that his expenses for the 2015 event were roughly $10,000. A handwritten note on the exhibit was noted, which stated "not including expenses," signifying that only $5,414 was collected from cash ticket sales.
With respect to his deposits at the end of 2015, Brian conceded they were not due to any contract that TeamUp Sports had with any organization, but rather from his previous employment.
Yadaira's counsel noted that Brian made a $30,000 deposit, which was withdrawn from his pension, shortly after discovering that the trial court's decision was being appealed. He currently does not have any money left in his pension because of this withdrawal. Brian also does not have a savings account. Yadaira's counsel additionally noted that, at one point, Brian deposited $20,500 into his account with a beginning balance of $0. The very next month, his beginning balance was $453.45.
Brian admitted that he only worked at New Vision Learning Academy for two months, despite previously telling the trial court he would hold the position throughout the school year. He also admitted that he did not look into the athletic director position in Union Parish, after telling the trial court it was his intention. Also contrary to what he had previously told the trial court, Brian stated he did not do any substitute teaching in Union Parish.
With regard to the position at GSU, Brian stated he had not received any offer in writing and had not started the job. He also stated that GSU had not paid him any money so far in 2016.
Brian acknowledged that the sleeping arrangements had not changed at his father's home. He stated that he still sleeps with the children in their bedroom or on a futon in the living room because his father's home has only two bedrooms. Brian conceded that his father continues to pay for the car note and insurance, but claimed he pays for the gas. He stated his father also pays the electricity bill for the home, as well as his cellphone bill.
On redirect examination, Brian testified that he had roughly $7,000 or $8,000 in his account to date.
Upon questioning by the trial court, Brian admitted he had a business loss of $17,000 in 2015. Additionally, the trial court noted that the Nissan contract with GSU was nothing more than "a hope and a prayer," to which Brian agreed. Brian conceded that his father still helps buy food and clothing for the children.
Yadaira was the final witness to testify. She stated that she lives in a four-bedroom, two-bath home with her mother. She and her mother own the home together and split the mortgage payments. Yadaira testified she is currently working as a financial coordinator at the Amateur Athletic Union headquarters making $30,000 a year. Prior to this position, Yadaira stated she worked for the Osceola County School District, where her annual income was $24,490.12. Additionally, she testified that she had been paying Brian $460 per month in child support.
Yadaira testified that her vehicle does not have a car note, she pays the car insurance, and she also pays the cellphone bill for herself and her mother. She reiterated the troubles she has had with Brian with regard to seeing and communicating with the children. In particular, she noted a time when she had to get the Monroe Police Department involved because Brian would not drop off the children unless she told him where she was staying. Yadaira stated she told Brian they would be staying in Louisiana because they had a hearing the next day, but she was still unable to get the children until a police officer arrived.
*676 With respect to the children, Yadaira stated she had already found good schools for them to attend. She stated they would be able to participate in the same extracurricular activities in Florida they do in Louisiana. With Yadaira's new job, the children could also be placed on her healthcare plan if they live in Florida.
The trial court issued lengthy reasons for judgment. It found that both parties have strong love, affection, and other emotional ties with the children. However, the trial court felt Yadaira's move to Florida was "motivated more by her antipathy toward Brian and Farmerville and less by the best interests of the children."
The trial court also found that the capacity and disposition to give the children love, affection, and spiritual guidance and to continue the education and rearing of the children was strong for both parties. However, the trial court stated it had concerns about Yadaira's attitude regarding the religious beliefs of Brian and his father.
With regard to the capacity and disposition of each party to provide the children with food, clothing, medical care, and other material needs, the trial court concluded that the evidence "is undisputed that Brian remains dependent on his father for the roof over his head, his transportation, and most of his living expenses. This plus the child support he receives from Yadaira are the only dependable sources of income and support that he has." The trial court also noted that it was undisputed the children are well cared for and all of their physical needs are met. However, the trial court struggled with finding Brian at fault for being dependent on his father and recognized that Yadaira was also somewhat dependent on her mother. Ultimately, the trial court found that neither parent had the capacity to provide for their children independent of the assistance from others. It stated that "the paramount concern is the best interest of the children and the capacity of a parent does not require autonomy or independence from external or third party support if that support is reliable and measurable."
The trial court noted that Yadaira's home is significantly larger and more accommodating for the children than Brian's home, but stated there was no indication that the living accommodations in Brian's home have had any adverse effect on the children.
The trial court found that the degree of continuity and stableness of the children overwhelmingly favored Brian. It noted that the children have lived in Farmerville since February 2014 and are involved in many activities. Brian's parents and other family members also live in the immediate area. Although the trial court admitted that Yadaira's arrangements indicate she could also provide a stable and adequate environment, it believed the continuity favored Brian, "[e]specially considering the young ages of the children."
The trial court stated there was no indication that the permanence, as a family unit, of Brian's home or Yadaira's home in Florida would be significantly different. It also found there was no significant difference between the moral fitness of each party as it pertained to the welfare of the children. It noted that the mental and physical health of each party was not significantly different; the home, school, and community history of the children had already been stated; and, the preferences of the children would not be deemed relevant due to their ages.
With regard to the willingness and ability of each party to facilitate and encourage a close and continuous relationship between the children and the other party, the trial court found that both parties had *677 exaggerated their own willingness to cooperate and the other's lack of cooperation. The trial court found it significant that, in November 2015, both parties admitted visitation exchanges had been done without any problems. It stated that the texting and telephone communication problems were minimal.
The trial court noted that, due to the great distance involved, one parent could have a significantly limited role in the life of the children. It also noted that Yadaira was primarily responsible for the care and rearing of both children prior to moving to Farmerville, but now that responsibility is shared between Brian and his father.
With regard to the domestic violence allegations, the trial court found that if there had been a physically abusive relationship, "it is inconceivable that there wouldn't have been some inference or mention of abusive behavior or apprehension of such." The trial court found Brian to be even-tempered and mild-mannered, while Yadaira "showed a greater propensity to anger."
The trial court again awarded joint custody of the children to the parties, with Brian being designated as the primary domiciliary parent.
On appeal, Yadaira contends that the trial court manifestly erred and abused its discretion by granting domiciliary status to Brian without adhering to the instructions outlined by this Court in Lowe I . Specifically, she argues that the trial court failed to: (1) give proper weight to a current presentation of the facts; (2) determine whether Brian met his burden of proving he is capable of providing the children with their basic material needs, independent of his father's generosity; (3) sufficiently weigh the best interest of the child factors; and, (4) properly address and analyze the domestic abuse allegations.
LAW
The paramount consideration in any determination of child custody is the best interest of the child. La. C.C. art. 131. The court is to consider all relevant factors in determining the best interest of the child. La. C.C. art. 134.[1]
The trial court is not bound to make a mechanical evaluation of all of the statutory factors listed in La. C.C. art. 134, but should decide each case by its own facts in light of those factors. Tuft v. Tuft , 51,293 (La. App. 2 Cir. 1/18/17), 214 So.3d 916 ;
*678 Semmes v. Semmes , 45,006 (La. App. 2 Cir. 12/16/09), 27 So.3d 1024. These factors are not exclusive, but are provided as a guide to the court, and the relative weight given to each factor is left to the discretion of the trial court. Id .
The trial court has vast discretion in deciding matters of child custody and visitation. Semmes, supra ; Wilson v. O'Neal , 50,711 (La. App. 2 Cir. 4/13/16), 193 So.3d 207. Therefore, the trial court's determination will not be disturbed on appeal absent a clear showing of an abuse of discretion. Bergeron v. Bergeron , 492 So.2d 1193 (La. 1986) ; Semmes, supra . As long as the trial court's factual findings are reasonable in light of the record when reviewed in its entirety, the appellate court may not reverse, even though convinced it would have weighed the evidence differently if acting as the trier of fact. Id .
The law-of-the-case doctrine generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. Pepper v. U.S. , 562 U.S. 476, 506, 131 S.Ct. 1229, 179 L.Ed. 2d 196 (2011) (quoting Arizona v. California , 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed. 2d 318 (1983) ). Thus, the doctrine may describe an appellate court's decision not to depart from a ruling that it made in a prior appeal in the same case. Musacchio v. U.S. , --- U.S. ----, 136 S.Ct. 709, 716, 193 L.Ed. 2d 639 (2016). The doctrine does not apply, however, if the court is convinced that its prior decision is clearly erroneous and would work a manifest injustice. Pepper v. U.S., supra .
The law-of-the-case principle is a discretionary guide which relates to (a) the binding force of a trial judge's ruling during the later stages of trial, (b) the conclusive effects of appellate rulings at trial on remand, and (c) the rule that an appellate court ordinarily will not reconsider its own rulings of law on a subsequent appeal in the same case. Welch v. Willis-KnightonPierremont , 45,554 (La. App. 2 Cir. 11/17/10), 56 So.3d 242, 248, writ denied sub nom. Welch v. Pierremont , 2011-0109 (La. 2/25/11), 58 So.3d 459. The reasons for the law-of-the-case doctrine are to avoid relitigation of the same issue; to promote consistency of result in the same litigation; and to promote efficiency and fairness to both parties by affording a single opportunity for the argument and decision of the matter at issue. Id .
DISCUSSION
In Lowe I , this Court concluded:
[A]fter reviewing this record, we find that the trial court erred in designating Brian as domiciliary parent . Our review of the record convinces us that Brian did not meet his burden of proving that he is capable of providing his children with their basic material needs, independent of his father's generosity. Consequently, we find that the interests of justice and the best interest of the minor children require that we remand this matter to the trial court for a determination of custody based upon a current presentation of the facts, particularly regarding Brian's capacity to provide the minor children with their basic material needs, independent of his aging father .
Here, this Court previously determined that the trial court erred in naming Brian the domiciliary parent, where after a review of the La. C.C. art. 134 factors, it concluded that Brian did not meet his burden of proving he could independently provide for his children's basic material needs. However, in Lowe I , this Court gave Brian the opportunity to prove before the trial court his ability to provide for his children, independent of his father's support.
*679 The trial court revisited the issue, and much of the trial testimony centered around the parties, primarily Brian's, ability to provide for the children. Notably, between Lowe I and the current appeal, little changed in Brian's circumstances.
After reviewing the record, we find that Brian failed to meet his burden of proving his capacity to provide the children with their basic material needs, independent of his father. Absent such a finding, and pursuant to the law-of-the-case doctrine, naming Brian the domiciliary parent is in error. We respectfully reverse the ruling of the trial court.
Both Brian's employment and income stability are still of concern to this Court. After years of trying to secure the Associate Vice President for Advancement position at GSU, Brian has yet to receive a written offer or any payment from GSU. Currently, GSU does not have the funds to offer the position to Brian at the minimum salary promised to him. Furthermore, according to testimony by Hilton, the position itself may be in danger as the current president may resign or be terminated pending ongoing board meeting discussions. If a new president is hired, he will likely hire his own team and Brian will no longer have a potential position at GSU, especially since his cousin is the football coach.
With regard to the contracts and events coordinated by Brian through GSU, few have provided compensation. Brian is not compensated for his work with the Eddie Robinson Classic, although he testified that he was compensated. Brian stated he received $15,414 from cash ticket sales for the Classic. The handwritten note on the paper exhibit stated that this amount did not include expenses. Brian estimated his expenses for the event were roughly $10,000, which would leave only $5,414 from cash ticket sales. According to Hilton's testimony, Brian was not compensated for this event. Additionally, he is not compensated for the Bayou Classic.
Further, Brian will only be compensated for the Adidas deal if GSU can secure the contract, and it was stated that none of the SWAC schools have been allowed to enter into these types of contracts to date. Additionally, it was agreed that the Nissan deal was nothing more than a "hope and a prayer."
Brian testified that TeamUp Sports made money in 2015 and 2016. However, on cross-examination, he stated that his deposits at the end of 2015 were not due to any contract that TeamUp Sports had secured.
Brian's tax returns and deposits are troubling. His total income for 2015 was $16,358. Although Brian made large deposits to his account toward the end of 2015 and the beginning of 2016, the money seemed to disappear quickly. At one point, Brian made a $20,500 deposit with a beginning balance of $0. The following month, his beginning balance in the account was $453.45.
Also troubling is the fact that Brian did not follow through on any of the employment opportunities he previously told the trial court he would pursue. He originally told the trial court that he would hold the position at New Vision Learning Academy throughout the school year. However, he held the position for only two months, earning a total of $3,039.71. Brian also told the trial court he was looking into the athletic director position in Union Parish. He did not pursue this job according to his own testimony. Finally, Brian previously told the trial court he was applying to substitute teach in Union Parish. He did not do this either.
According to testimony, Brian appears to secure jobs and make deposits around *680 the time of pertinent court dates. It seems this is what was done with regard to the job at New Vision Learning Academy prior to the last trial. Now, Brian has recently entered into a contract with Firmus Laboratory, receiving $25 for every specimen made. However, at the time of trial, Brian testified that he had not received any money from the company. Furthermore, Brian made a $30,000 deposit from his pension shortly after discovering the trial court's decision was being appealed. By doing so, he has completely depleted his pension. He does not have a savings account to rely on since this money is depleted.
It is clear from the testimony that Brian is still highly dependent on his father for the majority of his and his children's needs. His father provides a home for Brian and the two children. His father pays the car note and car insurance for Brian's vehicle, although Brian testified that he pays for the gas. Brian's father pays the electricity bill and Brian's cellphone bill. His father also helps purchase food and clothing for the children. It is obvious that Brian largely shares the responsibility of providing for his children with his father.
Based on the testimony and evidence introduced at trial, it is clear to this Court that Brian did not meet his burden of proving his capacity to provide the minor children with their basic material needs, independent of his father. Brian does not appear to have any sort of steady employment or income, he has completely depleted his pension, and he does not have a savings account to fall back on. Without his father, it is highly questionable whether Brian would be able to provide a home for his children, pay bills, and provide food and clothing on his own. Brian's father is already retired and roughly 70 years old. It is only a matter of time before he is no longer able to help Brian.
Yadaira has shown that she holds a steady job with a steady income. Although she splits the mortgage payment with her mother, it appears she is largely independent and able to provide for her children should something happen to her mother. For these reasons, we respectfully reverse the ruling of the trial court.
CONCLUSION
We find that Brian did not meet his burden of proving his capacity to provide the minor children with their basic material needs, independent of his father. On the first appeal, this Court analyzed and discussed the La. C.C. art. 134 factors and found that the trial court erred in naming Brian as the domiciliary parent. This Court remanded the case to the trial court for a further hearing on Brian's economic situation. Because we have seen no significant change in Brian's employment or economic situation from the previous trial, we find he did not meet his burden of proof. Therefore, under the law-of-the-case doctrine, the initial ruling of this Court that the trial court erred in naming Brian as the domiciliary parent will stand. Accordingly, Yadaira shall be designated the domiciliary parent. All costs of this proceeding are assessed to Appellee, Brian Lowe.
REVERSED.
BLEICH, J. (Pro Tempore ), concurs in the result.

La. C.C. art. 134 provides, in pertinent part:
Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10)The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11)The distance between the respective residences of the parties.
(12)The responsibility for the care and rearing of the child previously exercised by each party.