Judgment rendered July 8, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,551-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

ANTHONY D. MERRELLS                     Plaintiff-Appellee

versus

OLIVIA F. DOTRAY                        Defendant-Appellant

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 2019-1387

Honorable Alvin R. Sharp, Judge

* * * * *

KRISTEN B. PLEASANT                     Counsel for Appellant

JOHN C. ROA                             Counsel for Appellee

* * * * *

Before MOORE, PITMAN, and STEPHENS, JJ.

**MOORE, J.**

Olivia Dotray appeals a judgment that awarded primary domiciliary custody of the minor children, MM and ZM, to their father, Anthony Merrells, and denied Olivia's request to relocate the children to Arizona. She also contests the denial of her posttrial motions for new trial and for emergency custody. For the reasons expressed, we reverse and render.

### FACTUAL AND PROCEDURAL BACKGROUND

Olivia and Anthony were never married. They had met when they were students at ULM, in 2007, but both were in other relationships at the time. In fact, Olivia married another man, Luther, with whom she had twins in 2009, and has subsequently been awarded their primary domiciliary custody. Anthony never married his former girlfriend, Rachel, but they had a son, RM, together in 2008. Olivia and Anthony reconnected in late 2011, and he moved into her Monroe apartment in early 2012. Their son, MM, was born in November 2013, and daughter, ZM, in April 2017.

According to Olivia, running a household with four small children was always a "juggle" financially. She was initially working at CenturyLink, and eventually moved to NewWave Communications, an Internet and TV provider in Monroe, in early 2016, making about $36,000 a year. Meanwhile, Anthony worked intermittently at a sequence of small jobs, such as CenturyLink and Samsung call centers (where he was laid off or fired), and later, Truck Pros (until the shop burned down) and, currently, Jimmy Jazz, a shoe store in Pecanland Mall. He admitted that Olivia was usually on him about not contributing enough financially to the family. His true ambition, however, was entrepreneurial: in 2014, he formed an LLC, Black Heart Affiliates, to promote or host events in Monroe's African

American community. He testified that Black Heart does an event about once a month; a major one, like the annual "Purge" and "Kolossal," could earn him $10,000. Other weekends, he will merely promote somebody else's event, at a base rate of $250. He admitted that Black Heart's business is "up and down," and he sometimes loses money on events.

Not long after ZM was born, tensions reached a high point at home. Olivia testified that she was frustrated with Anthony's chronic lack of support and growing absorption in event promotions. The precipitating event was a milk run in late 2017, about which the parties gave widely divergent details; after he refused to go out and get milk for the kids, she threw him out of the apartment. After his ouster, Anthony bounced to various friends' apartments, sleeping on their couches. Eventually, he rented a townhouse apartment in Monroe's Town & Country area.

Initially, MM and ZM remained with Olivia. She enrolled MM in pre-K at Jack Hayes Elementary, near their apartments, and the couple informally agreed to split custody of MM, the son, 50-50, while ZM continued staying with Olivia. Olivia testified that she got repeated calls from the office at Jack Hayes reporting that MM was late for school, a fact that she attributed to Anthony's oversleeping. Anthony admitted to a few of these, but denied it was due to fatigue from late-night event promotions.

In 2018, Olivia's employer, NewWave, was acquired by Cable One, which downsized its Monroe operations but offered Olivia a transfer to its corporate office, in Phoenix, Arizona, at a salary to start at $55,000 and a $9,000 moving allowance. It was an opportunity for advancement that she simply could not pass up. She testified that in late 2018, she told Anthony that she intended to move to Phoenix with the kids, and he did not object;

Anthony, however, recalled she said only *she* was going to move, did not mention the kids, and this was what he agreed to. Olivia admitted that she never sent him, by registered or certified mail, a formal notice of proposed relocation under La. R.S. 9:355.5.

Olivia planned to leave for Phoenix in June 2019. Because she had not received any child support from Anthony since a $200 payment in October 2018, in early 2019 she filed an application with the La. Department of Children & Family Services ("DCFS") to get a child support order for MM and ZM. This was served on Anthony on April 9, 2019. Coincidentally, Anthony's former girlfriend, Rachel, also applied to DCFS for a support order, for RM, and this was served on Anthony on March 19.

In late April, Anthony filed the instant petition to establish custody and child support, and for a TRO to prevent Olivia from taking the kids to Phoenix. The district court granted the TRO. However, because Olivia's stepmother works for the Fourth JDC in some capacity, three hearing officers and the judge who granted the TRO recused themselves from the case. The matter was ultimately assigned to a different judge.

Olivia moved to dissolve the TRO, and proceeded with her move to Phoenix in June 2019, taking the twins with her but leaving MM and ZM with Anthony in Monroe. According to Olivia, Anthony did not take good care of ZM: she developed skin rashes and a swollen eye in June, and Anthony had no insurance to cover her hospital visit. In July, Olivia flew the kids to Phoenix, where she enrolled them in summer school or preschool programs and scheduled ZM for a hernia operation. They all flew back to Monroe in August for a hearing on Olivia's motion to dissolve the TRO.

3

The district court allowed Olivia to take ZM back to Phoenix for the surgery, but ordered MM to stay in Monroe with Anthony.

Trial on the merits was held over three days in September 2019. Only Olivia and Anthony testified, and they established the facts outlined above. Olivia testified that Anthony contributed little to the household while they had been together, little after they separated, defaulted on a car note that she cosigned for him, and then declared bankruptcy, in late August 2019, putting a blemish on her credit rating. She described her current house, a four-bedroom, two-bath rental in Phoenix; the school MM and ZM would attend; and the enhanced social and recreational opportunities there. She admitted she had no family connections in Phoenix, but her 20-year-old nephew had moved there with her, taken a job at a motel, and was helping her with the kids. She also testified that much of her work is online, giving her flexibility to tend to their needs. She admitted that Anthony was a good father who loved his kids, and that MM wanted to stay with him in Monroe. However, she felt that his suit for custody was retribution for her DCFS application for child support, which he would be patently unable to pay.

Anthony admitted that had been often "between jobs," helped financially when he could, and the household was sometimes behind on utilities, Wi-Fi, and phone, but never on rent. He described in detail his operations at Black Heart: he could stay out very late for events; a Facebook video showed some bawdy or suggestive things happening at one of them; and he had been cited or arrested for contributing to the delinquency of juveniles and fire code violations. He insisted, however, that he always left the kids with their grandmother or an aunt when he could not be home, so they were not exposed to his business. He claimed that he made $9,500 for

4

his "Spring Niq" event, in April 2019, but admitted that he used none of this to send any child support or pay down the car note that Olivia had cosigned. He admitted that his water was disconnected around Christmas, but blamed this on a "friend" who tried to "fix" the meter. He also admitted that he had pled guilty to domestic abuse battery on his earlier girlfriend, Rachel, and was placed on probation for this. He resisted Olivia's constant urging to get a "steady" job, feeling he could make more as an event promoter. He also described ambitious plans, such as moving Black Heart to Florida, where there would be more event possibilities; he was also a fulltime student at Grambling, needing three more years to graduate, and then he wanted to attend law school, and perhaps run for judge. He testified that he has placed MM and ZM on Medicaid, can take better care of ZM now, and wants custody of both so they can grow up together and not minimize his role as a dad. Also, in Monroe he has extended family, friends, and church connections to assist in childrearing. In spite of his dubious history of financial support, he insisted he was not a "deadbeat dad."

## ACTION OF THE DISTRICT COURT

The district court wrote a three-page ruling, first noting that Olivia did not follow the requirement of notice of relocation under R.S. 9:355.5. The court then held that all the Art. 134 factors were essentially even, except No. 3 (feasibility of preserving a good relationship with the noncustodial parent), which "slightly favored" Anthony, and No. 10 (ability of the noncustodial parent to relocate with the children), which favored Anthony. The court attached its standard "Article 134 Check Sheet" showing how it ranked each party on a scale of 1 to 5 on 25 factors extracted from Art. 134 and Title 9. Notably, the "Check Sheet" did not reflect the 2018 amendments to Art. 134.

5

However, in a footnote, the court stated that the new guidelines were "not relevant," given the findings as to factor No. 1 (love, affection, and emotional ties), and "not weighted" as to No. 8 (home, school, and community history of the child). The court rendered judgment denying Olivia's request to relocate, awarding primary custody of both children to Anthony, and granting visitation to Olivia during all major holiday periods and the entire summer vacation (except for two weeks with Anthony).

Olivia moved for an expedited appeal. In addition, she filed two motions for new trial, a motion to recuse the district court judge, and a petition for emergency custody. After hearings in October and December 2019, the court denied all posttrial motions. Olivia has appealed, raising five assignments of error.

## DISCUSSION

### *Failure to Apply the Amended Article 134*

By her first assignment of error, Olivia urges that the court erred when it did not consider the revised provisions of La. C.C. art. 134. This article was amended in May 2018 to include factors that the court did not consider: Factor No. 1, the "potential for the child to be abused as defined by Children's Code Art. 603, which shall be the primary consideration," No. 8, the "history of substance abuse, violence, or criminal activity of any party," and Subsection B, a history of family violence or domestic abuse. This argument has merit.

The legislature amended Art. 134 by 2018 La. Acts No. 412, effective on signature of the governor, May 23, 2018. Anthony filed this petition to establish custody on April 25, 2019, and Olivia filed her motion to dissolve the TRO on May 16. The amended article obviously applies to this case.

6

*Evans v. Lungrin*, 97-0541 (La. 2/6/98), 708 So. 2d 731 (applying the 1994 amendment of Art. 131 to a rule filed in August 1995); *Thomey v. Thomey*, 33,000 (La. App. 2 Cir. 4/7/00), 756 So. 2d 698 (applying the 1997 amendment of Art. 111 to a petition filed in March 1998).  It was legal error for the district court to utilize a "Check Sheet" based on the superseded version of Art. 134.

This error did not fully interdict the factfinding process, and thus does not mandate a complete de novo review.  *Evans v. Lungrin*, *supra*; *Singleton v. Singleton*, 51,476 (La. App. 2 Cir. 6/21/17), 224 So. 3d 1134.  However, we have previously stated that the district court's largely mechanical use of a checklist to determine custody under Art. 134 is "troublesome."  *Rutledge v. Rutledge*, 41,792 (La. App. 2 Cir. 12/13/06), 945 So. 2d 307.  Here, the error is particularly disturbing, as one of the omitted factors, Art. 134 A(1), is specifically stated to be "the primary consideration"; and two others, Art. 134 A(8) and B, are highly relevant to the case.  These factors, of necessity, weigh heavily on our review of the judgment for abuse of discretion.

### *Award of Custody*

By her second assignment of error, Olivia urges the district court erred in failing to properly consider the potential for the children to be abused and the application of the Post-Separation and Family Violence Act ("PSFVA"), as now required by La. C.C. art. 134 B.  She specifically shows that Anthony pled guilty to domestic abuse battery against Rachel, his prior girlfriend and mother of his older son, RM, and this should have been critical to his claim for custody of MM and ZM.  She also shows that in her motion for new trial, she alleged that she filed a police report against Anthony in April 2013 when, after an argument, he came home, struck the wall, and the washer and

7

dryer, with his fist, and forcefully grabbed Olivia by the wrist to stop her from using her cellphone. She submits that on this showing, the court's failure to apply PSFVA is reversible error, citing *Lewis v. Lewis*, 34,031 (La. App. 2 Cir. 11/3/00).

Anthony responds that PSFVA prohibits awarding custody to an abusive parent only when the acts of abuse were directed at the mother or the children of the relationship, not when they were directed at a third party, like Rachel. In support, he cites *Hollingsworth v. Semerad*, 35,264 (La. App. 2 Cir. 10/31/01), 799 So. 2d 548, and suggests the court did not err in giving little weight to domestic abuse battery of Rachel over 10 years prior. He also submits that the court considered the "appropriate" factors under Art. 134, without any abuse of discretion.

The district court has great discretion in child custody cases, and an award of custody will be disturbed only on a showing of abuse of that discretion. *McCormic v. Rider*, 09-2584 (La. 2/12/10), 27 So. 3d 277; *Mercer v. Mercer*, 52,101 (La. App. 2 Cir. 4/11/18), 249 So. 3d 924, *writ denied*, 18-0808 (La. 6/15/18), 257 So. 3d 681.

The factors to consider in determining a child's best interest for purposes of custody are stated in Art. 134, as amended in 2018:

> A. Except as provided in Paragraph B of this Article, the court shall consider all relevant factors in determining the best interest of the child, including:
>
> (1) The potential for the child to be abused, as defined by Children's Code Article 603, which shall be the primary consideration.
>
> (2) The love, affection, and other emotional ties between each party and the child.

8

(3) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the educat0ion and rearing of the child.

(4) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.

(5) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(6) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(7) The moral fitness of each party, insofar as it affects the welfare of the child.

(8) The history of substance abuse, violence, or criminal activity of any party.

(9) The mental and physical health of each party. Evidence that an abused parent suffers from the effects of past abuse by the other parent shall not be grounds for denying that parent custody.

(10) The home, school, and community history of the child.

(11) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(12) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party, except when objectively substantial evidence of specific abusive, reckless, or illegal conduct has caused one party to have reasonable concerns for the child's safety or well-being while in the care of the other party.

(13) The distance between the respective residences of the parties.

(14) The responsibility for the care and rearing of the child previously exercised by each party.

B. In cases involving a history of committing family violence, as defined in R.S. 9:362, or domestic abuse, as defined in R.S. 46:2132, including sexual abuse, as defined in R.S. 14:403, whether or not a party has sought relief under any applicable law, the court shall determine an award of custody or visitation in accordance with R.S. 9:341 and 364. The court

9

> may only find a history of committing family violence if the
> court finds that one incident of family violence has resulted in
> serious bodily injury or the court finds more than one incident
> of family violence.

As noted, the district court's "Check Sheet" omitted Subsection B.

Domestic abuse, as defined in R.S. 46:2132, "includes but is not limited to physical or sexual abuse and any offense against the person, * * * committed by one family member, household member, or dating partner against another." Anthony's guilty plea to domestic abuse battery of Rachel, his live-in girlfriend, qualifies as domestic abuse under this statute. We are not persuaded that *Hollingsworth v. Semerad*, *supra*, excludes Anthony's conduct from consideration. That case, a claim to modify visitation, applied the definition of "family violence" found in R.S. 9:362 (4): an act "committed by one parent against the other parent or against any of the children." It did not apply the standard of the new Art. 134 B, which incorporates the broader concept of "domestic abuse" found in R.S. 46:2132: an act "committed by one family member, household member, *or dating partner* against another" (emphasis added).

Moreover, there is a presumption that "no parent who has a history of perpetrating * * * domestic abuse, as defined in R.S. 46:2132, * * * shall be awarded sole or joint custody of children." La. R.S. 9:364. In support of her motion for new trial, Olivia introduced a Town of Richwood criminal investigation report showing that in April 2013, Anthony came to her apartment, damaged the front door, struck the wall, washer, and dryer, and lifted his hand to strike her but drew it back before making impact. The police report labeled this simple burglary, but no arrest was made. As it was not prosecuted, this incident may not establish a history of domestic abuse, which would exclude Anthony from receiving custody. However, it is

strong enough to weigh very heavily against an award of custody. The district court abused its discretion in not considering this and the guilty plea involving Rachel.

The other notable omission from the court's "Check Sheet" was Art. 134 A(8), "The history of substance abuse, violence, or criminal activity of any party." The incidents just described obviously qualify as violence or criminal activity. Moreover, in support of her motion for new trial, Olivia offered DVDs, one showing Anthony's promotional video for the "Purge" event (later canceled, owing to safety and security concerns) depicting the use of guns and violent pursuit. The other is outtake footage from the filming of the promotional video, showing that MM was on scene for the "shoot." While we appreciate Anthony's attempt to involve his son in the business, we must view this as exposing him to violence and potential criminal activity.

The court's treatment of the remaining factors is, in places, hard to follow. The written ruling states that factor No. 3 "appears to favor the father's position in that the feasibility of preserving a good relationship is pretty 'dim.'" However, factor No. 3 on the Check Sheet, following Art. 134 A(4), is the "capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs." This record easily shows that Olivia has been the responsible breadwinner of the family, working steadily and pursuing a promising career advancement, while Anthony documented exactly two pay periods from Jimmy Jazz, and nothing to prove any income from Black Heart; defaulted on a car note and declared bankruptcy shortly before the trial of this matter; admitted that his water was cut off; and paid so little child support that Olivia had to file with DCFS.

11

The district court compounded the confusion by elaborating, "Indeed, 'feasibility' means *possible to do easily or conveniently*. Such is not the case and will not be the case in this case." Travel may be difficult for Anthony because of his financial precarity, but it is by no means unfeasible. The district court's findings on this factor (or factors) are not supported by the record and are an abuse of discretion.

The district court further found, "Relative to financials, it was shown that the father made 'nice money' in his promotion efforts as well." We are constrained to find that aside from Anthony's self-serving testimony, there was not one scintilla of evidence to support the reputed earnings of Black Heart. In light of Anthony's poor history of child support, his bankruptcy filing, and his admitted problems paying for utilities, the district court's finding is unsubstantiated and is an abuse of discretion.

Anthony's situation reminds this court of the plaintiff in *Lowe v. Lowe*, 50,856 (La. App. 2 Cir. 5/18/16), 196 So. 3d 672; 51,588 (La. App. 2 Cir 9/27/17), 244 So. 3d 670; 52,593 (La. App. 2 Cir. 2/13/19), 264 So. 3d 1254. There, the father wove an impressive fabric of ambition, aspiration, and grand plans for a lucrative future, which the district court accepted as proof of ability to meet the children's material needs. However, the father consistently failed to make any of his plans materialize. On three occasions, this court reversed the award of custody, on a finding that the father offered no proof that he could meet the requirements of Art. 134. The same reasoning applies here.

As for the remaining factors, the district court did not abuse its discretion in finding that they are equally weighted between the parties. However, with the strong showing of a history of domestic abuse, the

exposure of one child to violence or potential criminal activity, and the overwhelming evidence of Olivia's superior ability to provide the children's material needs, we are constrained to find that the district court abused its discretion in awarding primary domiciliary custody to Anthony. This portion of the judgment is reversed, and judgment is rendered awarding primary domiciliary custody to Olivia.

### *Denial of Relocation*

By her third assignment of error, Olivia urges the district court erred in failing to authorize the relocation of the children to Phoenix. She argues that Anthony's custody claim was merely a "defense" against being ordered to pay child support, and that a fair analysis of the relocation factors, La. R.S. 9:355.14, would easily show the move is in the children's best interest.

Anthony responds that his custody claim was in good faith: the children were not under a formal custody order at the time, so he acted reasonably in trying to keep them in their hometown of Monroe. He also shows that Olivia did not provide the necessary notice of relocation, La. R.S. 9:355.5.

The cited statute, R.S. 9:355.5 A, requires that a parent seeking to relocate the principal residence of a child must give notice by registered or certified mail no later than 60 days before the proposed relocation. However, this requirement applies only to "an order regarding custody of or visitation with a child[.]" La. R.S. 9:355.2 A. No custody order was in force when Olivia verbally advised Anthony of her planned move to Phoenix, and the record easily shows that before he filed his custody claim, Anthony had actual notice of her intent to relocate the children. In this situation, the absence of 9:355.5 notice is immaterial.

Like custody rulings, relocation rulings are subject to the district court's great discretion. *Hernandez v. Jenkins*, 12-2756 (La. 6/21/13), 122 So. 3d 524; *Moore v. Moore*, 47,947 (La. App. 2 Cir. 3/6/13), 111 So. 3d 1120. The factors to consider in determining a contested relocation are listed in R.S. 9:355.14:

> A. In reaching its decision regarding a proposed relocation, the court shall consider all relevant factors in determining whether relocation is in the best interest of the child, including the following:
>
> (1) The nature, quality, extent of involvement, and duration of the relationship of the child with the person proposing relocation and with the non-relocating person, siblings, and other significant persons in the child's life.
>
> (2) The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child's physical, educational, and emotional development.
>
> (3) The feasibility of preserving a good relationship between the non-relocating person and the child through suitable physical custody or visitation arrangements, considering the logistics and financial circumstances of the parties.
>
> (4) The child's views about the proposed relocation, taking into consideration the age and maturity of the child.
>
> (5) Whether there is an established pattern of conduct by either the person seeking or the person opposing the relocation, either to promote or thwart the relationship of the child and the other party.
>
> (6) How the relocation of the child will affect the general quality of life for the child, including but not limited to financial or emotional benefit and educational opportunity.
>
> (7) The reasons of each person for seeking or opposing the relocation.
>
> (8) The current employment and economic circumstances of each person and how the proposed relocation may affect the circumstances of the child.
>
> (9) The extent to which the objecting person has fulfilled his financial obligations to the person seeking relocation,

14

including child support, spousal support, and community property, and alimentary obligations.

(10) The feasibility of a relocation by the objecting person.

(11) Any history of substance abuse, harassment, or violence by either the person seeking or the person opposing relocation, including a consideration of the severity of the conduct and the failure or success of any attempts at rehabilitation.

(12) Any other factors affecting the best interest of the child.

B. The court may not consider whether the person seeking relocation of the child may relocate without the child if relocation is denied or whether the person opposing relocation may also relocate if relocation is allowed.

The district court's "Check Sheet" does not track this statute, but R.S. 9:355.14 closely resembles Art. 134. This court is constrained to find that several of the district court's conclusions are not supported by the record. Olivia has been the kids' primary caregiver since birth; ZM, at the age of three, would be adversely affected by removal from her mother; Olivia's enhanced earning potential in Phoenix will benefit the quality of the kids' lives, socially and educationally; Olivia's current employment and economic circumstances are superior; and Anthony has palpably not fulfilled his support obligations. These facts, when properly considered, outweigh the other findings, which are mostly even between the parties. The district court abused its discretion in denying Olivia's request to relocate the children. This portion of the judgment is reversed.

We pretermit any consideration of Olivia's remaining assignments of error, which contest certain posttrial rulings.

## CONCLUSION

For the reasons expressed, the judgment is reversed. Judgment is rendered awarding primary domiciliary custody of the children, MM and ZM, to Olivia Dotray, and authorizing her to relocate to Phoenix, Arizona, with the children. Judgment is also rendered granting Anthony Merrells visitation during all major holiday periods and during the summer months, except for two weeks for Olivia Dotray in the summer. Any travel expenses incurred on behalf of the children to effectuate visitation are to be paid equally by the parties. All appellate costs are to be paid by Anthony Merrells.

**REVERSED AND RENDERED**.